Filed 8/4/14

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,      )
         )
     Plaintiff and Respondent,      )
         )      S077009
     v.      )
         )      Los Angeles County
ROBERT CARRASCO,      )      Super. Ct. No. BA109453
         )
     Defendant and Appellant.      )
_____ )

Defendant Robert Carrasco was convicted of the first degree murders of George Camacho and Allan Friedman, the second degree robbery of Friedman, and escape from jail. (Pen. Code, §§ 187, subd. (a), 189, 211, 4532, subd. (b)(1); all undesignated statutory references are to this code.) The jury also found true weapon-use sentence-enhancement allegations and special circumstance allegations that defendant committed multiple murders and that the murders were especially heinous, atrocious, or cruel. (§ 190.2, subd. (a)(3), (14), former §§ 1203.06, subd. (a)(1), 12022.5, subd. (a).) In addition, as to the Camacho murder, the jury found true the special circumstance allegation of financial gain, and as to the Friedman murder, the jury found true the special circumstance allegation of robbery murder. (§ 190.2, subd. (a)(1), (17).) The jury returned a death verdict, and the trial court entered a judgment of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).) For the reasons that follow, we vacate the true findings on the two section 190.2,

subdivision (a)(14) special-circumstance allegations (*post*, pt. II.B.6.c.) and otherwise affirm the judgment.

## I. FACTS

### A. Guilt Phase

#### 1. *Prosecution Case*

##### a. *Camacho murder*

On December 16, 1994, around 1:30 a.m., George Camacho was shot and killed at the Ross Swiss Dairy (the dairy) located on Albion Street in Los Angeles.

Dennis Martinez Morales testified that he lived in a camper that looked out on Albion Street and was located about 900 feet from the dairy. Between 1:30 and 1:45 a.m. on December 16, 1994, Martinez heard two to four gunshots. He then saw a person walk up the street from the direction of the dairy. The person was about six feet tall, dressed in dark clothing, wearing a black ski mask, and carrying a gun. The person got into the passenger side of a dark-colored car with louvers in the back, and the car sped away from the dairy.

Michael Fernandez testified that between 1:30 and 2:00 a.m. on December 16, 1994, he was driving his boss to her home on Albion Street. Fernandez observed a commotion by the entrance to the dairy and three people running from the area. They were wearing dark blue shirts and dark pants, and they jumped into a "Camaro, Trans Am-type" of car. Fernandez also observed a fourth individual walk past him, a 30- to 40-year-old Hispanic male with a thick mustache who was wearing dark baggy pants, a black or blue and white muffler, and a dark sweatshirt with a hood over his head. The man got into a Toyota with louvers in the back and a driver seated inside. Fernandez heard laughter and saw the Toyota leave, with the other car behind it, driving down Albion Street away from the dairy. The headlights on both cars were off.

2

Defendant was linked to the murder by his statements to coworkers. On December 16, 1994, Efrain Bermudez, who worked at the dairy, saw Camacho arrive at work around 1:25 a.m. Bermudez put on his bandana, walked out the dairy gate entrance, and less than a minute later heard six to eight gunshots. Bermudez saw two men, both about six feet tall and dressed in solid black, run to a car and enter on the rear passenger side. One man had come from the dairy, and the other had come from the parking lot. The car "peel[ed] out" and left, followed by a second car located farther down the block. Bermudez ran back into the dairy and saw Camacho bleeding from gunshot wounds.

Around 1:00 a.m. the following night, defendant told Bermudez "not to speak to nobody," and asked Bermudez, "Didn't you see me?" Bermudez said, "No." Defendant said, "I saw you. Uh-huh, you were putting on your bandana." Bermudez was speechless. Defendant also asked Bermudez if he had seen Camacho, and Bermudez said he "saw him bleeding to death." Defendant said, "Good." That same day, defendant bragged incessantly "about what he did."

Before the night of Camacho's murder, Bermudez had frequently seen defendant carry a .380-caliber gun. After the murder, defendant carried what appeared to be a .45-caliber weapon. Andrew Nunez, who worked at the dairy, frequently saw defendant carry a nine-millimeter gun after Camacho's murder. About two weeks after Camacho's murder, defendant pointed the gun at Nunez and said, "You think I did it."

Several months earlier, Camacho had been terminated from his job at the dairy, and defendant had assumed Camacho's shift from 1:30 a.m. to 9:00 a.m. Camacho later regained his job and was scheduled to return to work on December 16, 1994. About a week before that date, defendant told Nunez he hated to give up Camacho's shift because he would lose about $9,000 a month

3

from body shop work he could no longer perform during the day and from reductions in his dairy salary.

Harry Holton testified that he had fired Camacho around October 1994. Defendant bid for and was awarded Camacho's position. About two and a half months later, Holton learned from Robert Rios, a union representative, that Camacho had been wrongfully discharged and was going to return to his former shift. Holton told defendant this information. Defendant was "not pleased" and said losing the shift would cost him about $60,000 a year.

On December 16, 1994, defendant worked from 3:25 p.m. to 11:53 p.m. and was not working at 1:30 a.m. After Camacho died, defendant took over his shift, which was the same shift defendant had before Camacho's return to the dairy.

Anthony Morales testified that he had worked with defendant at the dairy. Defendant had carried a gun at work and was upset that Camacho was returning to work because defendant "wanted his job to do body work on cars during the day." On December 16, 1994, after Camacho's murder, Morales, defendant, and Mario Baltazar went to lunch. Defendant said he had shot Camacho and described the murder. Defendant said he had waited in front of the gate about half a block from the dairy with three other men and a woman. When Camacho was inside, "they ran towards him and shot him." They wore black hooded shirts or sweatshirts and drove two vehicles. Greg Janson, defendant's supervisor, paged defendant to let him know Camacho was out in the yard working where defendant would be able to shoot him. After the murder, he and the woman drove to the beach, and defendant threw the guns into the ocean. Defendant told Morales and Baltazar that "if anybody said anything, . . . he has plan B."

Janson testified, and his prior statement to police was read into the record. Janson described defendant as Hispanic with black hair and brown eyes, about five foot eleven inches tall, and 39 years old in February 1996. Janson had supervised

4

defendant for five years and often saw defendant carry a .380-caliber weapon. After defendant was told Camacho would be returning to work, defendant said "he would make sure he didn't come back" so that defendant did not "lose his . . . hours." After Camacho's murder, defendant told Janson he was responsible and threatened to also "take care of" anyone that got "in his way."

At some point during the six to eight months after Camacho's murder, coworker Steve Apodaca reprimanded defendant for horseplay, and defendant said, "You could be fired for horse playing, but not for shooting somebody."

The pathologist testified that Camacho was shot nine times; four of the wounds were fatal. His blood contained .38 micrograms of methamphetamine at the time of death. He died three hours after he was admitted to the hospital.

Seven spent .380-caliber semi-automatic casings and four .380-caliber fired bullets were recovered at the murder scene. Ballistics testing revealed that the casings had all been ejected from the same gun and that the fired bullets had all been fired from the same gun. The murder weapon was never recovered.

### b. Friedman murder

On October 24, 1995, Allan Friedman was shot and killed during a failed drug deal on Chicopee Avenue in Los Angeles County.

Shawna Ryder testified that on October 24, 1995, she lived on Chicopee Avenue. Around 1:30 or 1:45 p.m. that afternoon she heard a sequence of "pop, pop, pop," two men briefly arguing in muffled voices, and then another sequence of "pop, pop, pop." She recognized the second sequence of popping sounds as gunshots and called 911 as she left her home to investigate. A blue Honda drove away with two individuals inside. A black Jeep was parked in front of her home, and a young man with long hair was hanging out of the vehicle and bleeding.

Ryder and her neighbors pulled the man from the car. One neighbor gave her the license plate number of the Honda, which she relayed to the 911 operator.

The Honda was spotted and chased that night by Los Angeles Police Detective Harry Hollywood. The driver, Shane Woodland, ultimately abandoned the vehicle and fled into a home, where he was captured. Defendant's fingerprint was subsequently found on the cap of a hair spray can in the glove compartment of the Honda. A nine-millimeter bullet casing was in the right rear seat floorboard area. The murder weapon was never recovered.

Woodland testified that on October 24, 1995, he was 17 years old and worked with defendant at Perry's Auto Body Detail. The shop was owned by Javier "Gabby" Chacon. Woodland had lived at Chacon's home on Gilmore Street in Woodland Hills for about two years. Chacon had a second house in Woodland Hills on Winnetka Avenue at which he, his family, and defendant lived for a time. Woodland never lived with defendant.

On October 24, 1995, Chacon told Woodland to take defendant "somewhere" to buy cocaine and "make sure he comes back with the stuff." Chacon handed defendant a thick envelope of money, and Woodland and defendant left in a Honda Accord around 1:00 p.m. Defendant was in the passenger seat and placed a nine-millimeter gun in front of him. Defendant directed Woodland to a gas station where they saw Friedman in a black Jeep. Friedman motioned for Woodland and defendant to follow him. Friedman drove to Chicopee Avenue and pulled over, and Woodland and defendant pulled over behind him.

Defendant went to the driver's side of the Jeep and spoke with Friedman for about 10 minutes. Woodland heard three to four gunshots and saw defendant run back to the Honda. Defendant was holding a gun and a bag, and said, "Get the fuck out of here. Let's go." As they passed the Jeep, Friedman's body was hanging out of the Jeep, and defendant shot him again several times. Defendant

6

looked through the bag and said, "Fuck. Shit. It's not in here. Fuck." Defendant threw the bag out of the window.

Woodland asked, "What happened," and defendant said, "Just shut the fuck up. Don't worry about it." Defendant also said that if Woodland remained silent, "[n]obody's going to kill [him] and [his] family." Further, defendant said it was not the first time he had killed, and it was "just like popping a balloon" and was "nothing to him." Defendant told Woodland that he had killed someone at the dairy, and "nothing happened to him."

Woodland and defendant returned to the auto shop around 1:45 p.m. Around 4:30 p.m., Woodland had the windows of the Honda tinted. Later that evening, police arrested him.

Janson, in his testimony and prior statement to police, recounted that defendant had called him the night of October 24, 1995 and asked if the police were looking for him at work. Janson said no. Defendant came to work around 1:00 a.m. and received permission to leave at 5:00 a.m. when Janson's shift ended. Defendant described Friedman's murder to Janson, saying that he and another person, a "kid," had planned to give the victim a kilo of cocaine in exchange for $25,000 or $35,000 and then shoot the victim and keep both the cocaine and the money. Around noon, after the exchange took place, the victim returned to his black Jeep, and defendant followed him and demanded the cocaine be returned. The victim started to leave, and defendant shot him and grabbed a bag containing what he thought was the cocaine; in fact, the bag contained a book. As defendant and his companion left, the victim was moaning, so defendant shot him "a bunch more times." Defendant showed Janson a Smith & Wesson nine-millimeter gun that he had used in the murder.

Defendant and the "kid" drove away from the crime scene in a "blue Honda, or something like that." The kid wanted to get the car windows tinted. Defendant

7

objected, saying he did not think it would be wise to drive around in a car that had just been involved in a murder. After being stopped by police, the kid fled into a house where he was captured. Defendant asked Janson to tell police that defendant was with Janson in Green Valley that day.

Defendant also told Janson that the owner of the body shop at which defendant worked was the person who "ha[d] the drugs" and owned the Honda that was the getaway vehicle. Defendant was living with the owner at that time and was dating his wife.

In defendant's residence, police found nine-millimeter ammunition, a magazine to a nine-millimeter gun, and a gun-cleaning kit. In the truck defendant was driving at the time of his arrest, there was a loaded .380-caliber semi-automatic pistol on the right front seat floorboard.

Woodland's fingerprint was found on the outside of the passenger door of Friedman's Jeep. Two nine-millimeter bullets were found in the Jeep, and five nine-millimeter casings were on the ground near the rear of the Jeep. Two kilos of cocaine were found on the floor of the rear seat. A yellow knapsack containing Friedman's driver's license and other personal papers was recovered by a passerby one or two blocks from the crime scene and turned over to police that night.

Los Angeles Police Detective Michael Coblentz testified that defendant waived his rights and gave a statement to police. Defendant said he was at work at Perry's Auto Detailing during Friedman's murder, not with Woodland, and that he had never been in a blue Honda. Coblentz also interviewed Delia Chacon, Javier Chacon's wife, and she then visited defendant. Defendant subsequently called Coblentz, and the two met again. Defendant changed his statement to say he was having an affair with Delia Chacon and was with her at the time of Friedman's murder.

8

During the preliminary hearing in April 1996, defendant told Woodland "not to worry about anything because he was going to kill the witnesses," and "there wouldn't be witnesses by the time we go to trial." Janson had not yet testified at the preliminary hearing, and defendant said he was going to call someone and "make sure he didn't get on the stand." After Janson testified at the preliminary hearing, defendant started laughing and told Woodland, "See, I told you he wouldn't say nothing." Woodland subsequently pled guilty to manslaughter and received a six-year prison sentence contingent on his testifying truthfully in this case.

A pathologist testified that Friedman was shot seven or eight times and died of multiple gunshot wounds.

### c. Escape

On May 31, 1997, defendant, who was a trustee or inmate worker, escaped from the North County Correctional Facility. He was arrested the following night about 40 miles away in West Los Angeles.

### 2. Defense Case

### a. Defendant's background

Defendant and his wife at the time, Eva Carrasco, testified to general background information about defendant.

Defendant testified that he was 10 years old when his father died. At that time, defendant lived in the Mar Vista housing project with his mother, brother, and sisters. They lived in a "very bad neighborhood" that was "[o]ne of the worst in L.A." Although defendant was only 10 years old, he was given a .357 magnum revolver by "[s]ome older . . . teenagers." Defendant kept the gun away from his siblings for their protection. Since that time, he had kept firearms for protection. Around 1975, he had a .380-caliber special for which he was the registered owner.

9

Defendant had worked in the "body and fender business" since he was 16 or 17 years old. When he was 18 years old, he opened his own body shop in Culver City called "Bert's Custom Paints and Auto Body," which stayed in business for four to five years. Most of his customers were Culver City and Los Angeles police detectives. Defendant hired "youngsters" to work at the shop to teach them the trade and thereby offer them an alternative to selling drugs.

After the shop closed, defendant went to work at the Edgemar dairy. He continued doing car body work on the side and hiring young people to teach them the trade. He "always broke even" or lost money; at one point, he was in bankruptcy proceedings. It generally took him three months to finish work on a car, and he earned on average $1,500 for each job.

Defendant and Eva separated on January 1, 1995. From then until about October 1995, defendant did his body and fender work at Big G's, which was the warehouse for Perry's Auto Detailing and was located about 150 yards away from Perry's. He paid his rent by doing body work for the shop's customers. Defendant worked on only one or two cars for his own customers, including Janson's car. After paying his help and utilities, he had "nothing left." Defendant did not work on Anthony Morales's car during this time but had previously done so when he worked out of his garage. Janson worked for defendant for about four or five months both at defendant's house and at Big G.'s.

Eva Carrasco testified that she and defendant had been married for 17 years and separated around November 1994. Before the separation, Janson came to the house about six times to help defendant work on cars. Defendant owned a firearm for many years that was small and always in a case. She had never seen defendant carry a gun. (Defendant and Eva dissolved their marriage in December 1998.)

10

### b. *Camacho murder*

Defendant testified that he started working at the Ross Swiss Dairy around 1989 as a driver and at that time met Camacho. Defendant "always talked" to Camacho and observed that "[h]e had a big heart" and was "the nicest guy [he] ever met." Defendant "never had a problem with him." After three years at the dairy, defendant began working on the dock and had greater contact with Camacho. The two had arguments at times and once almost had a fist fight, but neither threw a punch or was hurt. Defendant and Camacho were friends, and defendant "was closer to him than anybody in that dairy."

Defendant started carrying a gun after the Los Angeles riots because the route he drove took him by buildings that had been burned. He always had a firearm with him and "never had an incident with any of them." Defendant said he never carried a gun at the dairy while he was working. However, he recalled a time when he had the gun with him and gang members jumped the dairy fence. Janson called him over, and he told the "youngsters" to leave. He had "never pointed a gun at anybody in [his] life."

Defendant was voted a shop steward by his coworkers and served in that position for about a year in addition to his regular job duties. During this time, Camacho was terminated, and defendant successfully bid for his position. Defendant earned 5 cents an hour less than he had in his job as a relief worker, and he worked from 1:30 a.m. to 9:30 a.m. for two to three months. After a month or so, he realized that working Camacho's shift as well as his second job left him only three hours to sleep. Defendant was initially upset when he learned Camacho had been reinstated. But when he learned his new schedule would be from 4:00 p.m. to 12:30 a.m. or from 6 p.m. to 2:30 a.m., he thought working either of these shifts would have "been perfect" because he would get six hours of sleep.

11

Defendant said it was "ridiculous . . . for them to say that I . . . kill[ed] somebody for those kind of hours."

Defendant never told anyone at work he earned $7,000 or $9,000 a month doing body and fender work, or that he was upset about Camacho coming back to work because he would lose money on his side business. Defendant did not tell Harry Holton that defendant stood to lose $60,000 if Camacho returned to work. Instead, Holton "misunderstood" when defendant said he would be "better off if [Camacho] came back and did his old job, and [defendant] went off of that job." He did not know where Holton got the figure of $60,000 and said, "Harry just figured that out by himself."

As shop steward, defendant knew Camacho had a drug problem. Defendant was upset that the union representative had rejected his suggestion that Camacho attend a drug therapy program as a condition for returning to work. Defendant had attended such a program for a year and succeeded in quitting all drugs when he was 30 years old.

On December 16, 1994, defendant arrived at work at 1:25 a.m. because he understood that if Camacho did not show up for work, defendant would need to work his shift. Defendant, who was wearing beige pants, noticed that the front gate was wide open, which was "not right." He heard gunshots and ducked down. He saw Brian Skolfield from the projects where he grew up, "standing right over" Camacho and "unloading in him." Skolfield looked directly at defendant as if to say, "You better not say nothing," and then took off running. Defendant saw no one with Skolfield. Skolfield "went up the block and jumped in a car." Defendant looked at Camacho, knew he was dead, and fled.

Defendant had met Skolfield, who was white and 22 or 23 years old, about a year before the murder when Skolfield accompanied a friend named "Gangster" to defendant's house to watch defendant work on Gangster's car. Defendant did not

12

know Gangster's last name. Defendant had also seen Skolfield talking to Camacho before Camacho was fired. Skolfield later was housed next to defendant in jail. Skolfield was a member of the Culver City gang.

In his statements to police after Camacho's death, defendant did not tell them he saw Skolfield murder Camacho because it would have put his life and the lives of his daughters and sisters in danger. Defendant said he had lived in the projects for 21 years and knew "the way gangs are." While in jail, defendant asked Skolfield why he had shot Camacho, and Skolfield told defendant it was "none of [his] business" and "to keep [his] mouth shut."

Defendant never told anyone that he shot Camacho. Anthony Morales was lying when he said defendant had laughed and talked about killing Camacho because Morales "got fired and he blames everything on me." Efrain Bermudez also lied about defendant's statements because he was about to be fired before he walked off the job and "because I'm the shop steward, . . . they tell me, 'You didn't do enough to save my job.' " Defendant never saw Bermudez on the night of Camacho's murder but recalled Bermudez wore a bandana daily. Andrew Nunez lied to "impress the family." Defendant had never gotten into an altercation with Nunez, threatened him, or been reprimanded because of anything Nunez reported to the company. Nor had he been in a confrontation with Morales, threatened him, or pulled a gun on him. Defendant had never learned of any complaint filed against him by Nunez, Bermudez, or Morales, nor had there been any "write-up" through the dairy or union for anything he allegedly had done to these men. Nor had defendant faced any union proceedings because of something Janson had said defendant had done either to Janson or at work. Holton did not lie, he "just misunderstood what we were talking about" and was a "little angry because Anthony Morales had said that I said that Harry knew about it."

13

Defendant was interviewed twice by police after Camacho's murder. He was arrested in February 1996, waived his rights, and spoke to police for a third time for two hours. He did not know Janson had given a statement to police until after the preliminary hearing.

Albert Ramirez testified that he had worked with defendant at the Ross Swiss Dairy. Defendant was a hard worker but also "used to play around like a . . . little kid [was] in him." Ramirez never saw defendant with a gun at work and never saw him hit anyone at work. Ramirez asked defendant if he had shot Camacho, and defendant said no.

Ramirez recalled a barbecue held on a Friday after work at some point before Camacho was murdered. At the barbecue, Ramirez got into a fist fight with Bermudez, and defendant tried to break up the fight by reminding Ramirez and Bermudez that they worked together daily. At some point during these events, a friend of Bermudez's hit defendant on the side of the head with a gun and then pointed the gun at Janson.

Mario Baltazar, who worked at the Ross Swiss Dairy, testified that on December 16, 1994, the same day Camacho was murdered, he went to lunch with defendant and Morales. Defendant did not say he had shot Camacho. Baltazar was to be laid off when Camacho returned to work, so he joked at work that day that he had shot Camacho. Other coworkers also joked that they had committed the murder. Baltazar had never seen defendant with a gun at work, nor had defendant, who was a "nice guy," ever threatened him.

### c. *Friedman murder*

Delia Chacon, the wife of Javier Chacon, testified that on October 24, 1995, she lived in Woodland Hills on Winnetka Avenue with her family, defendant, whom she called "Bertie," and Shane Woodland. Defendant had lived there since

14

August 1995 and shared a bathroom with Woodland. Delia had for years purchased Rave hair spray, the brand found in the blue Honda, and "[e]verybody" in the household used it, including defendant. About four or five months before Friedman's murder, Delia's son, Javier, Jr. or "Little Gabby," bought the blue Honda in which Woodland was later arrested. Everyone living at the house and at the body shop used the Honda to run errands. There were also guns, including nine-millimeter handguns, in the house. Delia had seen Woodland, but not defendant, with guns.

Woodland had lived with Delia's family for about five years when he was arrested in this case, and Delia considered herself his mother. Shane Woodland and his brothers Ryan and Brandon worked at Perry's Auto Detailing, which was owned by the Chacons and had two locations. Defendant also worked there doing body work and painting for his own customers as well as for the Chacons.

On October 24, 1995, Delia and Shane were at Perry's Auto Detailing. Delia saw Shane with "some" kilos of cocaine. Delia left work around 11:00 a.m. and drove to Topanga. There, around noon, she met defendant, whom she described as her best friend and with whom she was in love. The two drove for half an hour to the mountains above Pepperdine University to talk and look at the ocean. They left the mountains by 1:30 p.m. and drove back to Topanga. Although she and defendant lived in the same house, they frequently met in Topanga to go to the mountains and talk because her husband was jealous. She lied to detectives investigating Friedman's murder and told them she had not seen defendant on October 24 so as not to "put his life in danger." Defendant was her "significant other" and a part of her.

Delia had seen Janson at Perry's Auto Detailing about 10 times before and after Friedman's murder. She kept a copy of the Friedman "murder book" (a collection of investigative reports on that homicide) in the shop office, and anyone

15

could go into the office and look at it. Delia frequently saw Janson in the office. She received the three-inch-thick murder book from Barry Woodland, Shane's father, about two days after Shane was arrested, and placed copies in her home and both auto detailing shops. On cross-examination, after learning that Shane's attorney had received no discovery until November 20, 1995, Delia said it could have been as many as 10 days after Shane's arrest that she received the murder book.

Defendant testified that he had lived with Shane but had never ridden in a car with him because he was a reckless driver. Delia and Javier Chacon were like parents to Shane. Shane's two brothers also worked at Perry's Auto Detailing. Defendant used hair spray at the Chacon's house; it was found "in every bathroom."

Defendant learned that Javier Chacon was a drug dealer when he entered a Big G's warehouse one Sunday, "found out what they were doing in there," and decided not to renew his lease. He had moved out by January 1, 1996.

Defendant testified he was with Delia on the day Friedman was murdered and recounted alibi details that were similar to Delia's testimony. When he made his first statement to police, he did not tell them he had been with Delia in the mountains at the time Friedman was shot because he did not want to get Delia into trouble with her husband or face retribution from him, and he did not want his wife to find out he had been with Delia. Instead, he lied to police and told them he had been at work during the murder. He loved Delia as a friend, and the two had never been intimate.

Defendant did not know Friedman and had never seen him. Defendant denied having been on Chicopee Avenue on October 24, 1995 with Shane, and Shane was lying when he said otherwise. Defendant had "never shot anybody in [his] life." One week before Shane testified that defendant "did it," Javier Chacon

16

told defendant that he thought defendant was "with his wife and that he's going to have Shane say this." Defendant believed Shane was lying for Javier.

Defendant recalled going to Janson's house on October 25, 1995 but did not tell him about a murder that had occurred the day before. Defendant did not carry a nine-millimeter weapon or tell Janson that he needed to get rid of the weapon because it had just been used in a murder. Defendant never told Janson he needed an alibi. Janson was a "close . . . friend." Defendant assumed Janson lied because he had refused to pay Janson for a poor job Janson had done while working for defendant. Defendant was not surprised by Janson's preliminary hearing testimony because Janson was taking heavy doses of Prozac and Klonopin at that time and was "acting really strange." Defendant recalled occasions on which he would have a conversation with Janson and the next day Janson would recall "nothing that we talked about," but then "the next day he would remember everything." Defendant did not tell Shane prior to the preliminary hearing that certain witnesses were not going to testify against him, because he had no way of speaking to Shane.

Thomas Cuosineau testified that on October 24, 1995, around 3:00 p.m., he heard shots fired and ran out onto Chicopee Avenue. He saw a blue Honda in the middle of the street and another car that looked similar to Friedman's Jeep parked at the curb. Two men got into the Honda and drove towards Cuosineau. They were white, in their early twenties, and had short dark or black hair. The passenger had a mustache.

Ronald Allen testified that on October 24, 1995, he lived on Chicopee Avenue. He heard three gunshots, there was a pause of several seconds, and then he heard six more shots. Allen saw a blue Honda parked next to a black Jeep. Inside the Honda were two "clean cut" white males with closely shaven heads or

17

very short hair and protruding ears. The back and rear windows of the Honda were tinted.

### d. Escape

Defendant testified that while in jail he became a trustee. Once a trustee, defendant spent at least three to four months planning an escape and described to the jury the elaborate details of his plan, which ultimately included three other trustees. He planned the escape so that no one would be endangered or harmed. Defendant would not disclose where he obtained a hacksaw and said no one picked him up after his escape. He "didn't think about what [he] was going to do" after the escape. He escaped on a Saturday around 5:30 p.m. and was apprehended without resistance the next night around 10:00 p.m. He escaped because Javier Chacon had visited defendant's wife, which meant he was trying to tell defendant he knew where his wife and children were, because he was incarcerated based on a fingerprint and someone merely saying he had committed murder, and because there had been dangerous race riots in jail.

Delia Chacon testified that on May 31, 1997, the day of defendant's escape from jail, Delia visited defendant and sold her car. She did not recall what she and defendant discussed. After defendant escaped, Delia knew police were looking for her but did not contact them because she had nothing to tell them. Since defendant's capture, he had never spoken to her about his escape, and she had never asked him why he escaped. Around the time of the escape, Delia had obtained a restraining order against her husband because of spousal abuse.

### 3. Rebuttal

Detective Michael Coblentz testified further about his interview with defendant. Defendant did not tell Detective Coblentz about a person named Brian Skolfield, and Detective Coblentz had only learned about him that afternoon

18

during defendant's testimony. Detective Coblentz asked defendant if he knew Shane Woodland. Defendant said that he barely knew Woodland, did not tell Detective Coblentz that he lived with Woodland, and said that the last time he had seen Woodland was either two weeks or two or three months before Woodland's arrest. When Detective Coblentz asked defendant if he had ever been in the Honda, he showed defendant a photograph of the car. Defendant said he had not been in that Honda before, and he gave no explanation for why his fingerprint was in the Honda. Within an hour after Detective Coblentz's interview with defendant, defendant spoke with Delia Chacon and then called Detective Coblentz and asked to meet again.

While interviewing defendant, Detective Coblentz did not mention Janson's statement to police about defendant's involvement in the murders. Detective Coblentz did not speak to defendant after the day of his interview and, in particular, did not have a conversation with defendant after the preliminary hearing about Janson's statement. Janson told Detective Coblentz he changed his statement to state that he did not recall anything pertinent because of fear.

Detective Coblentz further testified that Woodland's attorney had received discovery, including the police reports, on November 20, 1995. Woodland told Detective Coblentz on February 10, 1997 about his role in the Friedman murder.

Brian Skolfield testified that in 1997 he was incarcerated in the North County Correctional Facility with defendant. Skolfield was born in 1977, grew up in Culver City, and was about 17 years old on December 16, 1994. He had never been to East Los Angeles, did not know where the Ross Swiss Dairy was located, and was not at the dairy on December 16, 1994. He further testified that he did not know Camacho, was not owed any money by Camacho, and did not shoot him.

19

### 4. *Surrebuttal*

Los Angeles County Deputy Sheriff James Ponsford testified that he had worked at the North County Correctional Facility in 1996 and 1997. Defendant and Skolfield were incarcerated at the facility at the same time, and Deputy Ponsford recalled seeing both men in the same building.

## B. Penalty Phase

### 1. *Prosecution Case*

In addition to relying on the circumstances of the crime presented at the guilt phase, the prosecution introduced victim impact testimony.

Francisca Deleon, Camacho's mother, testified that Camacho was her firstborn child and only son. He was a successful athlete and made the varsity football team when he was only a sophomore in high school. She described Camacho's happiness when he learned he had gotten his job back. Camacho was 29 years old when he was murdered. He was married. He had two children, who were five and six years old when he died. Deleon's children were "the most important thing in [her] life," and after Camacho's death she "just wanted to die" because she "couldn't stand the pain of losing" him. Camacho's father, also named George Camacho, described attending his son's sports practices and the constancy with which he thought about his death.

Camacho's younger sister Christine testified she was close to her brother and his children. Camacho was murdered right before Christmas, and Christine said "[t]here is an overwhelming sadness whenever we as a family get together" and that gathering for Christmas "is just a huge reminder." She was "extremely proud of him for the way he loved his kids."

Shlomo Friedman, Allan Friedman's father, testified that Allan was his firstborn son and was 28 years old when he was murdered. Allan was born in Israel and moved with his family to the United States when he was 15 years old.

20

"Everybody loved" Allan, and he and Allan were very close.  When Allan died, Shlomo wanted to take his own life, but his children told him they needed him.  Shlomo had not told his parents in Israel that Allan had died because he did not "want them to die."  Shlomo had been unaware Allan was involved with dealing drugs.  When asked how his life will be in the future, Shlomo replied, "What life? What life?"

Soli Friedman, Allan's mother, testified she owned a restaurant and had made lunch for Allan 20 minutes before he died.  They were very close and "were like friends."  His death had left her "crying for life."  She worked three jobs and spent time with "the kids, [because] that's the only time I feel [a] little better and I don't have to think about what happened."

Galit Friedman, Allan's younger sister, described Allan as a very gentle and friendly person who had not had the same opportunities she had.  Galit and Allan had been close, and she missed him.

### 2. *Defense Case*

Martha Heredia, defendant's mother, testified that defendant was born in Torrance and was 41 years old.  When defendant was four years old, the family — which included defendant's father, three sisters, and an older brother — moved to Culver City.  Defendant attended St. Gerard's Catholic School in Culver City.  When defendant was 10 years old, his father died.  Martha could not work and take care of her five children, but the family received some insurance money from the father's service in the Navy.  The family lived in a bad neighborhood and moved into a four-bedroom home in the projects.

Defendant went to work at McDonald's when he was 13 years old and used the money to buy his own clothes, which helped the family.  Defendant attended Venice High School.  He never missed school and graduated when he was 17

21

years old. While in high school, he played football and worked. He did not play varsity football his senior year because he had injured his neck.

Martha organized a group in the projects to help older children; the group held fairs and organized trips. Defendant helped by "get[ting] all the kids together."

When defendant was 17 years old and still in high school, he started a body and fender shop. The shop was in the same location for about five years. Defendant continued to perform body and fender work after it closed. He had young people working for him "[a]ll the time." Martha knew many of the boys.

Defendant had a terrific sense of humor but laughed when he was nervous. He never displayed physical anger at home. Once, when he was about 14 years old, he was in a fight with "kids," but it was "nothing serious." Martha was aware of no fights that defendant had as an adult. Defendant had a quick temper but "never did anything about it" and "would just go off by himself." He never joined a gang, carried a gun, or upset the household in any way, except for two "scrapes." When he was 11 or 12 years old, he and a "bunch of kids broke into" the school. Defendant was not suspended but was punished at home. When defendant was about 17 years old, he and his friends were in a drunken brawl, were taken to jail and released the next day. He had no adult felony convictions and was never in a juvenile detention center. He would play football with the neighborhood children and was "always trying to stop" gang members and others in the neighborhood from fighting.

After high school, defendant passed the written test to become a firefighter but did not pass the physical because he had suffered a broken vertebrae and was considered a "risk." He continued to live at home until he was 22 years old and was helpful and responsible.

22

When defendant was in his early twenties, he married Eva Carrasco. The couple moved about a mile away from Martha, and she saw them every day and babysat their oldest daughter. Small children in the couple's neighborhood would come to their door and ask defendant to come out and play with them, and he "was like that with his daughter."

Defendant started working at the Knudsen Dairy when he was 25 or 26 years old and then moved to the Ross Swiss Dairy. Defendant's stepfather also worked at the Ross Swiss Dairy with defendant for a short time.

Leandra Kamba, defendant's younger sister, testified that defendant moved out when she was about 16 years old. Kamba found growing up in the Mar Vista projects "fun" and did not perceive it "was a bad neighborhood." The area was "not that safe, but not . . . very dangerous." The family was close. Their father died when Kamba was three years old. Defendant was "always there" for her and her sisters, "protect[ing] us all the time" and playing with Kamba constantly. Defendant had always been compassionate and nice to everyone. Defendant was a loving parent, and Kamba's three children loved him. Defendant carried a gun for protection, but she had never seen him be violent or threatening. He did not "have a mean bone in his body." She never witnessed any fits of rage or any violent behavior. Defendant had never "laid a hand" on his wife Eva or on Kamba, and "he has never, that I know, in my whole life . . . hurt anybody." On cross-examination, Kamba testified that she knew defendant had involved their sister Frances in his escape from jail and that, as a result, she had suffered a conviction. Kamba believed that defendant was in a "desperate situation" when he called Frances and that Frances did not understand the consequences of what she was doing.

Barbara Carrasco-Gamboa, defendant's older sister, testified that their family was very close and happy. Barbara and her sister graduated from the University of

23

California at Los Angeles (UCLA), and their older brother Ricardo also attended UCLA. Defendant was a straight-A student through elementary school but became distracted in high school because of his interest in auto body repair.

When their father died, defendant assumed "a father figure role" because he "felt that since our father was gone and he was a bigger guy," he should "protect all of us." Defendant was "a big guy" with a gruff voice but "had a real great sense of humor," was "very intelligent," and was a "pretty compassionate guy."

Defendant was never involved in gangs and was opposed to them. He was "always concerned with the young guys," and he, Barbara, and two other siblings were involved in Westside Barrios Unidos, an organization devoted to "get[ting] kids out of gangs." The group held several successful dances, and Barbara and the others "checked everyone who went into the dance" for weapons. Even law enforcement officers "came to know [defendant] as someone who was really trying to make an effort . . . to get these kids going [o]n the right path."

Barbara explained that "[w]e really didn't like the idea that people looked at us with a lot of prejudice living in the housing projects," because while "[m]ost of us were poor, . . . most of us had the same goals as everybody else." Barbara recalled that "our friends' mothers would say they don't want our friends to come visit us in the projects because they were worried about getting into some kind of trouble." Defendant was "always concerned [with] trying to dispel those kinds of negative stereotypes."

Barbara was diagnosed with cancer in 1995, received three years of chemotherapy, and was admitted to the hospital on several occasions. She leaned on defendant for support during this "grueling experience," explaining "he really believes in the Lord and he was praying a lot for me."

Barbara had never seen defendant "in a fit of rage . . . [or] having any sort of physical confrontation with anyone" while they were growing up. Nor had she

24

ever seen defendant carry a gun. She was not aware that defendant had any arrests while he was in school and believed that he had no adult felony convictions. On cross-examination, she testified she was unaware he had been arrested for grand theft auto in 1974, petty theft in 1975, possession of a controlled substance in 1977, carrying a concealed weapon in a car in 1984, possession of phencyclidine (PCP) for sale in 1986, or assault with a deadly weapon in 1990.

Eva Carrasco testified that she met defendant in 1975 in high school. They began dating during their senior year. They started to live together around 1978 and married in 1980 when Eva was 23 years old. Eva had their first daughter when she and defendant were both 20 years old and stayed home with her. Four or five years later, defendant encouraged Eva to go back to college and supported her until she graduated. Their oldest daughter was now 20 years old and a junior at UCLA. She telephoned, visited, and corresponded with defendant. Their second daughter was eight years old, and the youngest daughter was four years old.

Eva observed that all of the "children love[d] [defendant] very much," and defendant was "very playful with them." The couple had separated, but they never argued or "discussed anything" in front of the children, so the children knew little more than that their father was "away now." The couple had been in counseling in 1996 to keep the relationship "[a]s connected and as harmonious" as they could for the children. Defendant called the younger girls at least three times a week, and they always asked when he was coming home. They also had visited him.

When defendant was about 20 years old, he started a body shop in Culver City. He started with a "couple of old cars, and he did a really good job and word got around and he got a little busier." A few years later, when the shop was busy, the building in which it was located was torn down. After the body shop closed, defendant went to work at a dairy with his stepfather.

25

Eva had never seen defendant be violent. He was arrested for substance abuse in his twenties, but he attended a rehabilitation program and did not suffer a felony conviction. The couple drifted apart because Eva wanted to buy a house whereas defendant "still want[ed] to help these kids" with his time and money and Eva "never saw any return[]."

Eva said defendant "has always been very car[ing] of others," a "very hard worker" who "never wanted to miss work, [and] never wanted to be late." He was very encouraging with Eva and his sisters "to improve, [and] to do good." He had "always been there for all of us," he was "a compassionate guy," a good dad and husband, and he was "always trying to help people."

### 3. Rebuttal

Richard Morrison testified that he worked with defendant at the Edgemar dairy. Defendant was "just a regular, friendly fellow worker," and the two had never had a confrontation. One night, around 9:00 or 10:00 p.m. in the fall of 1979 or 1980, Morrison was working outside in the yard. On his way back to the plant area, defendant approached, pointed a gun at Morrison, and said something like, "Get out of here." Morrison was frightened and left work and told no one but his wife what had happened. The next day, he called the dairy and quit because he was afraid his life was in danger.

### 4. Surrebuttal

Defendant testified he had worked with Morrison between 1977 and 1980. There were other Hispanic employees at the dairy. When Morrison left the dairy, Morrison told everyone he had a new job. Defendant did not know why Morrison would say defendant pulled a gun on him. Defendant was never written up for any misconduct at the dairy.

26

Defendant further testified that he had not suffered a felony conviction. He had been convicted of a misdemeanor for driving under the influence "[s]ometime" in the 1980s. He had also been arrested for possessing PCP for sale because he was carrying drugs and $800 in cash. Once defendant explained that he had just cashed his paycheck and showed officers his pay stub, they dropped the sale charge. Defendant went through a drug diversion program and was on probation for a year.

Defendant also had been arrested for carrying a concealed weapon. He showed the law enforcement officers "all the money and the checks I carried from work," and said he was the only driver who had not yet been robbed but that he expected he would be. The officers simply returned the weapon, which was registered, and told defendant not to carry it again. The arrest for grand theft auto occurred when defendant was 14 or 15 years old; he had helped friends push a car down an alley not realizing it was stolen. No charges were pursued. On cross-examination, defendant said he did not recall being arrested for assault with a firearm.

Defendant also had been arrested for being drunk in public. He paid $50 bail, and "they just let me out." He acknowledged he "used to have . . . a drug and alcohol problem" that started when he was eight years old and "older kids would give [him] . . . reds and PCP." Defendant tried to stop using drugs in his twenties and "for three years . . . had really bad problems in stopping" and "went through the hardest time of [his] life." He finally stopped when he was 30 years old. Defendant was now 41 years old and had not used any drugs since he was 30.

Defendant regularly called the young men who had worked for him doing body and fender work. He observed that "they used to be drug dealers . . . and one of the biggest ones he runs his mother's business now and . . . goes to college." When counsel asked why he worked with these men when he was not making any

27

money, defendant replied, "Go to the corner across the street from the police station.  Tell me what you see.  You see kids selling drugs.  You see shootings . . . .  [This area] wasn't like this 15, 20 years ago . . . .  When I had my shop when I was young, I was making a lot of money and I always had like $3,000 in my pocket cash, and I had 11 cars and I was not happy."  Defendant described seeing his friends in gangs getting shot, overdosing on drugs, and getting arrested, "all being killed because of drugs."  Defendant had attended "a friend's funeral every six months," asked himself what he could do, and then "just started hiring them."  When he had first started his business, he had told these young men not to go to his shop because it was a business.  But then he realized, "[W]hat am I doing?  I am being like everybody else, . . . not caring, . . . not sacrificing nothing."

## II. DISCUSSION

### A.  Pretrial Issues

#### 1.  *Right to counsel and cocounsel*

Defendant contends the trial court violated his right to counsel by refusing to appoint his previously retained counsel at state expense or to allow retained counsel to withdraw.  Defendant also contends the court abused its discretion in denying his motion for appointment of cocounsel pursuant to section 987, subdivision (d).  We conclude that the court acted within its discretion in denying counsel's request for second counsel, that defendant was not prejudiced even if the court erred in not appointing counsel, and that defense counsel abandoned his request to withdraw.

### a. Facts

Defendant was arrested for Friedman's murder in February 1996 and was represented by retained counsel, Tom Kontos. On July 17, 1996, Kontos was relieved, and Robert Beswick was substituted in as retained counsel for defendant.

In March 1997, defendant was indicted for the Friedman and Camacho murders and, in June 1997, charged with escape in a separate action. On July 2, 1997, the prosecution informed the trial court, and had apparently previously informed defendant, that it would seek the death penalty.

On October 20, 1997, Beswick filed a motion for appointment of second counsel. (§ 987; see *Keenan v. Superior Court* (1982) 31 Cal.3d 424, 430 (*Keenan*) [trial court has discretion under former statutes governing appointment of counsel to appoint a second attorney to assist in the defense of a capital case].) In his supporting declaration, Beswick said that the "case is a consolidation of two separate charges of murder," involving "separate facts and circumstances," and an escape charge. He said, "Essentially, it is as if counsel is representing the defendant in two separate murder cases with an escape charge thrown into the mix." He noted that "defense of this matter will involve extensive investigation, forensic work, and the use of experts. [¶] . . . The investigation will require the questioning of various witnesses and persons who could provide evidence which would be favorable to the defense. Additionally, inspection of the vehicle which was allegedly used by the defendants needs to be analyzed as well as certain items taken from the vehicle," and Beswick said he "intend[ed] to hire forensic experts to evaluate the physical evidence." Beswick noted he "was privately retained, however, the fee was substantially less than would be necessary to defend against a capital charge involving two separate murders. Counsel is a sole practitioner and as such cannot devote the necessary time needed to question and investigate the facts and circumstances surrounding this case without compromising and

29

prejudicing the remaining practice.  Moreover, because of the seriousness of the charge and the penalty it is imperative that every aspect of the case be analyzed legally to insure that the defendant is given the full protection of the California and United States Constitutions."  Beswick also observed that although he had "represented defendants in numerous capital cases" (apparently referring to cases in which special circumstances were alleged), "he ha[d] never represented a [defendant in a] capital case involving the death penalty."

On October 21, 1997, Judge Czuleger denied the application for second counsel because it "fail[ed] to provide any specific or compelling reasons requiring the assistance of additional counsel."

On November 20, 1997, defendant sought reconsideration of his motion for second counsel.  He also moved the court to appoint Beswick as counsel, meaning he would be paid by the court, and requested that Beswick be permitted to withdraw if he was not appointed.  Beswick's supporting declaration provided: "The majority of my practice is devoted to the practice of criminal law, however, I have never had to represent a defendant in a death penalty case.  I have never represented an individual who has been charged with committing two murders, both of which have been combined into one trial.  I request additional counsel to [e]nsure that . . . defendant receives a complete and full defense."  Beswick estimated that he "will have to interview and/or cause[] to be interviewed approximately 60 witnesses," review those statements, and "more than likely re-interview those individuals who[se] statements prove to benefit the defendant."  Beswick also anticipated hiring a forensic expert and investigator to aid in the preparation of the defense, and "monitor[ing] and supervis[ing] these individuals."  Beswick noted that "nothing connect[ed] the two murders," and "each investigation and defense is in effect a separate" trial requiring him "to prepare what is essentially two different defenses," and "two separate sentencing hearings

30

as both murders will have distinct mitigating factors." Additionally, "defendant has been charged with escape from a detention facility against which I will have to provide a defense." Beswick anticipated that "the trial will last from four to six weeks," and he "intend[ed] to make numerous pre-trial motions."

Beswick observed that although he had been retained and "received a small retainer fee at the outset of this case," neither defendant nor his family had "the funds to pay my fees," and he had not been paid. He said, "To continue representing the defendant on my own will be ruinous to my practice in that I will not be able to devote my time to my other clients and I will not be able to produce income for my firm. Additional counsel will allow me to continue my practice as well as [e]nsure that the defendant is well represented." Beswick also observed that when he was retained, he "was neither aware of the second murder nor was I aware that the District Attorney's office would be filing a second murder charge and alleg[ing] special circumstances." He said, "Given the complexity of the case and the indigence of the defendant I feel that it is appropriate that not only should additional counsel be appointed but also that I should be appointed by the court. The burden of representing the defendant who is indigent in this matter without additional counsel and without appointment will be overwhelming. There is a genuine need for additional counsel as well as . . . for the court to appoint me." Beswick added, "Should the court not feel that there is a need for additional counsel and for appointment of myself, then I respectfully request that the court allow me to withdraw and that a public defender take over representation."

The court again denied the motion, stating, "[C]ounsel for defendant has failed to demonstrate good cause for appointment of a second counsel. The case is not a complex one. Counsel's contentions that there are two murders, counsel is a sole practitioner, he has not been fully paid, he has not represented a defendant in a death penalty case and that 'a second attorney may lend important assistance

31

with preparing for trial or presenting the case' are not sufficient grounds for appointment of second counsel." Judge Czuleger also stated that "[c]ounsel's alternative request to be relieved from the case and the Public Defender's Office appointed, *must be brought before the bench officer who is currently hearing this matter and is therefore denied without prejudice*." (Italics added.)

On December 11, 1997, Beswick informed the trial court, Judge Michael Harwin, that Judge Czuleger had denied his motion and that the order had instructed Beswick to make his request for appointment to Judge Harwin. Beswick did not inform the trial court of his request to Judge Czuleger that he be permitted to withdraw from the case absent appointment. Judge Harwin indicated that he would consider the motion whenever Beswick made it and said that the court expected Beswick "to "prepare[] for trial on [his] own." Beswick responded, "Definitely and I am; absolutely."

On January 8, 1998, Beswick filed with Judge Harwin an application to be appointed as counsel. In Beswick's supporting declaration, he said he was originally retained to represent defendant against one murder charge. Counsel was paid a retainer, and defendant agreed to make periodic payments once the retainer had been exhausted. No payments had been made, and counsel had not been compensated for almost two years. After Beswick was retained, defendant had been charged with a second murder and escape, and the district attorney had decided to seek the death penalty. Beswick had "never represented a defendant charged with two murders in a death penalty case" and would undoubtedly need to spend significant time preparing. Beswick anticipated he would need to question 30 to 40 witnesses, believed that the case would involve numerous motions, and noted that the district attorney's office had estimated that the trial could last over two months. He said, "Essentially I [am] to remove myself from my practice of which I am the sole practitioner. To work for the period of time required without

32

compensation would prove disastrous to my practice and my employee." Beswick said he could not continue to represent defendant "for the duration of the trial without compensation" and that to do so "would not only cause me great financial hardship but . . . it would also impact the defendant in that I would be very hard pressed to provide the representation needed while at the same time trying to save my practice." Beswick did not ask the trial court to allow him to withdraw from the case if he was not appointed.

On January 13, 1998, Judge Harwin informed Beswick, "You should clearly understand regardless of the ruling" on the motion for appointment "that you will be starting trial on" February 2. Beswick replied, "That I understand," and earlier in the hearing had said, "I am ready to go."

On January 16, 1998, Beswick filed a supplemental declaration in support of the application to be appointed. Beswick explained that in mid-1996, he was approached by defendant's sister, who was a secretary in Beswick's suite and whom Beswick had known for many years. Defendant's sister indicated that defendant, who was charged with murder, was represented by counsel but that she and her family were interested in retaining Beswick. Beswick met with defendant's family and "discussed the case. Initially the case was rather straight forward with witness statements which at best were inconclusive. The family was at this point desperate and persuaded me to represent [defendant]. Given my familiarity with the family and the nature of the case I agreed to represent [defendant] for [a] reduced fee. Neither [defendant] nor his family had the financial resources to pay the type of fees attendant to representation in a murder case." Beswick was paid a $15,000 retainer, which he billed against a rate of $300 an hour. "The family signed a retainer indicating they would pay my fees and any costs as they were incurred." After the agreement was signed, the "family suffered from financial hardship and were thus unable to make any further

33

payments towards my fee," nor did defendant's friends, whom defendant said would contribute, help in paying the attorneys fees. Beswick said that the case had gone from a single murder charge in which the identifications were suspect to a death penalty case involving two different murder charges and an escape charge, and that in one of the murder cases, a former codefendant now identified defendant as the shooter. Beswick said that because the case was going to last two to three months, during which time he would receive no income, "I will be unable to maintain my practice if I am not appointed to represent [defendant]."

Beswick's declaration also stated that because Shane Woodland, the former codefendant in the Friedman case, was represented by a public defender, the court would need to appoint private counsel for defendant "in the event I was not involved in this case." Beswick was mistaken, however. Woodland was not represented by the public defender; he was represented by Bruce Hill, who was privately retained.

On January 28, 1998, Judge Harwin denied the application to appoint Beswick, stating, "the bottom line is, you did get retained and you had been paid substantial monies, even . . . if not all you would have wanted." Beswick replied, "I appreciate the court's consideration. Obviously, my stance was it was a single murder case, now it's turned into a second murder case death penalty and escape. As I tried to bring to the court's attention, I've got much more than I bargained for and much longer trial [than] I anticipated." The court said, "I understand. I don't, in good conscience, see how I can bill the county for that." Beswick did not request to withdraw from the case or have alternate counsel appointed. He continued to represent defendant throughout the trial.

34

*b. Analysis*

*i. Second counsel*

Defendant contends Judge Czuleger abused his discretion in denying defendant's request for second counsel. Section 987, subdivision (d) provides in relevant part: "In a capital case, the court may appoint an additional attorney as a cocounsel upon a written request of the first attorney *appointed*. The request shall be supported by an affidavit of the first attorney setting forth in detail the reasons why a second attorney should be appointed." (Provision repealed and reenacted without substantive change, Stats. 1998, ch. 587, §§ 3, 4, pp. 3912–3913, italics added.) Here, Beswick was retained, not "appointed." But even assuming section 987, subdivision (d) authorized the appointment of second counsel, Judge Czuleger did not abuse his discretion in declining to do so.

" 'The appointment of a second counsel in a capital case is not an absolute right protected by either the state or the federal Constitution.' " (*People v. Lancaster* (2007) 41 Cal.4th 50, 71.) " ' "The initial burden . . . is on the defendant to present a specific factual showing as to why the appointment of a second attorney is necessary to his defense against the capital charges." (*People v. Lucky* (1988) 45 Cal.3d 259, 279.) An "abstract assertion" regarding the burden on defense counsel "cannot be used as a substitute for a showing of genuine need." (*Id.* at p. 280; *People v. Jackson* (1980) 28 Cal.3d 264, 287 [no abuse of discretion in denying application for second counsel when counsel merely relied on the circumstances surrounding the case].)' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 278.) "We review the trial court's decision denying a request to appoint second counsel for abuse of discretion." (*Ibid.*) "The abuse of discretion standard is used in many other contexts and reflects the trial court's superior ability to consider and weigh the myriad factors that are relevant to the decision at hand. A trial court will not be found to have abused its discretion unless it 'exercised its

35

discretion in an arbitrary, capricious, or patently absurd manner that results in a manifest miscarriage of justice.' " (*People v. Roldan* (2005) 35 Cal.4th 646, 688 (*Roldan*).) Defendant fails to make such a showing here.

Defendant relies on *Keenan*, in which we concluded that appointment of second counsel was justified because the trial would occur seven weeks after counsel's appointment, the case involved complicated scientific and psychiatric testimony, and five other criminal cases were pending against the defendant and the prosecution intended to rely at trial on evidence related to those cases. (*Keenan*, *supra*, 31 Cal.3d at pp. 432–434.) Here, by contrast, Beswick had represented defendant for over a year in the Friedman case and over six months in the Camacho case at the time the motion for second counsel was made. Although Beswick had never tried a case in which his client faced the death penalty, he had tried what he described as "numerous capital cases," by which he apparently meant cases in which special circumstances were alleged, and the bulk of his practice was devoted to criminal law. Moreover, the factual circumstances and associated legal issues of the two murders were not complex. The cause of death in both cases was undisputed, and defendant was implicated in both crimes by his statements to others and, in the Friedman murder, by eyewitness testimony and the presence of his fingerprint inside a vehicle associated with the crime. (See *Roldan*, *supra*, 35 Cal.4th at p. 688 [case that involved eyewitnesses who had identified the defendant as the gunman and testimony regarding the defendant's "damaging and incriminating admissions" was "quite straightforward"].) Indeed, defendant said he was not present when Friedman was murdered and testified that he had witnessed Camacho's murder. Defendant also faced an escape charge, but the evidence and legal issues associated with the escape were neither extensive nor complicated. No prior convictions were alleged, and the special circumstances and penalty phase case-in-chief evidence dealt only with the charged crimes. In

36

sum, the court's ruling that defendant had failed to justify the appointment of a second attorney was not an abuse of discretion.

Having concluded that Judge Czuleger did not abuse his discretion in denying defendant's motion for second counsel, we need not consider defendant's further claim that the wrongful denial of the motion resulted in ineffective assistance of counsel.

### ii.   Motion to withdraw

Defendant contends that the trial court erred in not granting counsel's motion to withdraw if he was not appointed. As noted above, Judge Czuleger denied counsel's request without prejudice, stating, "[c]ounsel's alternative request to be relieved from the case and the Public Defender's Office appointed, must be brought before the bench officer who is currently hearing this matter and is therefore denied without prejudice." Beswick never renewed his motion to withdraw in the trial court and hence abandoned the motion.

### iii.   Appointment of counsel

Defendant contends the trial court abused its discretion in not appointing Beswick. We disagree.

Beswick served as counsel for defendant until after filing a new trial motion. Therefore, even assuming the trial court erred in failing to appoint Beswick, defendant was not prejudiced on the ground that he was denied his counsel of choice. Nor do we find that defendant received ineffective assistance of counsel because of the trial court's failure to appoint Beswick. (See *post*, pt. II.D.) Finally, we reject defendant's claim that there was state interference with defendant's right to counsel. The trial court acted within its discretion in denying the motion for second counsel, and Beswick never moved to withdraw in the trial

37

court.  Instead, he continued to serve as defendant's counsel despite the denial of the motion for appointment of counsel.

### 2. *Representative cross-section*

#### a. *Financial hardship*

Defendant asserts he was denied a jury drawn from a representative cross-section of the community because the trial court failed to provide adequate compensation for jurors and excused prospective jurors on the ground of financial hardship.  We reject the claim.

The parties stipulated in the trial court to excuse prospective jurors whose employers would not pay for at least 25 days of jury service.  Defendant did not object to the panel or move to quash the venire.  This claim is therefore forfeited on appeal.  (*People v. Fauber* (1992) 2 Cal.4th 792, 816.)

The claim is also meritless.  " 'Under the federal and state Constitutions, an accused is entitled to a jury drawn from a representative cross-section of the community.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16; *Duren v. Missouri* (1979) 439 U.S. 357, 358–367; *People v. Howard* (1992) 1 Cal.4th 1132, 1159.) That guarantee mandates that the pools from which juries are drawn must not systematically exclude distinctive groups in the community.  [Citation.]  "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren v. Missouri*, *supra*, 439 U.S. at p. 364; [citation].) . . .  If a defendant establishes a prima facie case of systematic underrepresentation, the burden shifts to the

38

prosecution to provide either a more precise statistical showing that no constitutionally significant disparity exists or a compelling justification for the procedure that has resulted in the disparity in the jury venire [citation.].' " (*People v. Burney* (2009) 47 Cal.4th 203, 225–226.)

As to the first element of the *Duren* test, defendant lists 127 prospective jurors he claims were excused because their employers did not pay for at least 25 days of jury service, three prospective jurors he claims were excused because they were self-employed, four who had prepaid vacations or business trips, one who had numerous business commitments, one with childcare issues, and four who were unemployed. Based on this list, he contends that the court should "recognize poor people as a distinctive group which was systematically excluded from [defendant's] jury because the trial court could not or would not provide adequate compensation for jurors in this long trial."

Even assuming individuals who are poor constitute a cognizable group (but see *People v. Johnson* (1989) 47 Cal.3d 1194, 1214), the fact that an employer would not compensate an employee for at least 25 days of jury service, or that an individual had a prepaid vacation or business trip or was experiencing childcare issues, does not reveal any information about the prospective juror's financial status or demonstrate that he or she was poor. Indeed, the cited prospective jurors worked for a wide range of companies such as banks, insurance companies, and hospitals. The employer for the prospective juror excused due to childcare concerns placed no limit on the number of days she would be paid for her jury service. And, as the Attorney General observes, one of the cited prospective jurors actually served on the jury. The facts here do not establish a prima facie case of systematic underrepresentation.

In this and certain other appellate claims, defendant contends the asserted error infringed upon his constitutional rights. "In those instances where he did not

present constitutional theories below, it appears that either (1) the appellate claim is one that required no objection to preserve it, or (2) the new arguments are based on factual or legal standards no different from those the trial court was asked to apply, but raise the additional legal consequence of violating the Constitution. 'To that extent, defendant's new constitutional arguments are not forfeited on appeal.' (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.) No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." (*People v. Loker* (2008) 44 Cal.4th 691, 704, fn. 7.)

### b. Convicted felons

Defendant further claims that the exclusion of convicted felons from jury service denied him his right to a jury selected from a representative cross-section of the community. During voir dire, a prospective juror revealed that he had previously been convicted of burglary and robbery and served a prison term. The parties stipulated to excusing the prospective juror. Defendant has therefore forfeited this claim on appeal. (See *People v. DeSantis* (1992) 2 Cal.4th 1198, 1216–1217.) On the merits, we have previously rejected this claim, and defendant cites no persuasive reason to revisit our conclusion. (*Id*. at p. 1217, fn. 2.)

## B. Guilt Phase Issues

### 1. Right to be present

Defendant contends he was denied his right to be present at critical stages of the trial. " 'Under the Sixth Amendment, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination." ' (*People v. Butler* (2009) 46 Cal.4th 847, 861 (*Butler*), quoting *Kentucky v. Stincer* (1987) 482 U.S. 730, 744–745, fn. 17.) In addition, a defendant has a due process

right 'to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.' (*Kentucky v. Stincer*, at p. 745.) 'Neither the state nor the federal Constitution, nor the statutory requirements of sections 977 and 1043, require the defendant's personal appearance at proceedings where his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him.' (*Butler*, at p. 861.)" (*People v. Lynch* (2010) 50 Cal.4th 693, 745–746 (*Lynch*).)

Defendant cites 33 times in the record that he claims he was not present for discussions between the court and counsel. The record affirmatively indicates he was present for at least a portion of two of these occasions. As to the remaining times, defendant's absence is not noted in the record. Even assuming he was absent, he fails to demonstrate that his presence bore a " 'reasonable, substantial relation to his opportunity to defend the charges against him.' " (*Lynch*, *supra*, 50 Cal.4th at p. 746.) The proceedings at issue were all similar to those involved in prior cases in which we rejected a claim that a defendant's right to presence was infringed. (See, e.g., *id.* at pp. 745–746 [the defendant's personal presence was not required at discussions of jury selection procedures]; *People v. Kelly* (2007) 42 Cal.4th 763, 781–782 [the defendant's personal presence at a hallway conference not required when a prospective juror "was questioned and ultimately excused for cause because the prosecutor had personally prosecuted" a relative]; *People v. Perry* (2006) 38 Cal.4th 302, 312–314 [the defendant's presence was not required at a conference on whether certain spectators should be excluded from the courtroom]; *People v. Box* (2000) 23 Cal.4th 1153, 1191–1192 [there was no constitutional or statutory violation caused by the defendant's absence at hearings involving discussions of whether questioning by defense counsel or codefendant's counsel had opened the door to certain evidence or inquiry]; *People v. Waidla* (2000) 22 Cal.4th 690, 741–742 [the defendant had no right to be personally

present at hearings involving procedural, evidentiary, and housekeeping matters, including a discussion of jury instructions].)

### 2. Failure to preserve evidence

Defendant contends that the prosecution committed misconduct by failing to preserve a hair spray can. We reject the claim.

### a. Facts

At trial, the prosecution presented evidence that defendant's fingerprint was lifted from a hair spray can located in the glove compartment of the car driven by Shane Woodland to the Friedman murder scene. Before trial, on September 10, 1996, defendant filed a motion for discovery of, among other things, "[a]ll physical evidence obtained in the investigation of this case, whether or not the People intend to and/or may use it against the [d]efendant." On or about December 29, 1996, defendant filed a motion for a discovery compliance order, stating, "There is information that a certain hair spray can was seized from the vehicle driven by codefendant Woodland on which a fingerprint was discovered belonging to defendant. . . . An examination of the can was requested for the purpose[] of investigating for the presence of fingerprints." At the February 3, 1997 hearing on the motion, the prosecutor informed the court, "I've indicated to counsel that what he wants is in evidence over at L.A.P.D., and I'm going to walk over with him and have another homicide detective show him what in fact he wants to see, which is the latent lifted off the can . . . . [H]e also wants to see the can, and I don't have any problem with that." The prosecutor also said, "The only discovery item that counsel indicates he wanted was the can and the latent print. . . . It is available, to my knowledge." That day, the prosecutor learned from Detective Lopez, however, that after an evidence technician photographed the can and lifted the fingerprint, the can had been left in the car and was no longer

42

available. The prosecutor later explained her understanding that the can had been left in the car and the car had been released to its owner. Counsel was so informed and, a week later, filed a motion to preclude any use or mention of the can.

Over a year later, before the prosecutor's opening statement, defendant sought a ruling on his motion to exclude evidence of the hair spray can. Defense counsel conceded that he could not prevent the prosecutor from introducing evidence that defendant's fingerprint had been found on a can inside the vehicle. But because he could not know if this was the "same can," defense counsel sought to exclude a photograph showing the can inside a glove compartment. The court precluded the prosecutor from mentioning the can in her opening statement but subsequently concluded that the fact that the can was now missing went to the weight of the photograph, not its admissibility.

Before evidence of the fingerprint was presented, defense counsel unsuccessfully objected to admission of evidence regarding defendant's fingerprint on the can or "even mentioning . . . the can of hairspray" because the can had not been preserved. The prosecutor said the can had been left in the car and, presumably because the car had been returned to its owner, "was not available anymore." Forensic print specialist Charles Caudell then testified regarding the presence of defendant's fingerprint on the can. He also said it was possible that the latent print remained after the print was lifted from the can, but an expert could compare the lifted fingerprint with fingerprint exemplars from a suspect. After lifting prints from a window or door, Caudell did not retain the window or door because he had lifted and recorded the "impression of the latent fingerprint." He was "usually . . . the last one to analyze" an object on which a fingerprint was found "because I'm putting on a powder that may contaminate other analys[e]s."

43

During cross-examination of defendant, the prosecutor asked, "your print was the only print that stayed on the can, right?" Defendant replied, "That is what they say. But they can't even find the can." The prosecutor said, "Can't find the can, but they found your print; yes, right?" Defendant also unsuccessfully raised the prosecutor's failure to preserve the can in his new trial motion.

### b. Analysis

"The state has a duty to preserve evidence that both possesses 'an exculpatory value that was apparent before the evidence was destroyed,' and is of 'such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' (*California v. Trombetta* (1984) 467 U.S. 479, 489 (*Trombetta*).) Moreover, a constitutional violation is not established unless the authorities acted in bad faith in failing to preserve potentially useful evidence. (*Arizona v. Youngblood* (1988) 488 U.S. 51, 58 (*Youngblood*).)" (*People v. Schmeck* (2005) 37 Cal.4th 240, 283.)

Defendant contends that it is possible a second latent print of the same fingerprint introduced at trial could have been taken from the can. He does not suggest, however, how such a print would have given him any information in addition to the lifted print. Defendant also asserts it may "have been possible for a defense expert to determine whether or not there was ever any print on the can to be lifted or if the print was lifted from somewhere else." In addition, he contends the can "could have been tested for accompanying fingerprints besides" defendant's, and that the "presence of other person's fingerprints could have created a reasonable doubt that [defendant] occupied the Honda at the time of the murder." He further contends the can was also potentially useful "to analyze how old it was and how long it had been in the car. If the can had been placed inside

44

the vehicle long ago, its usefulness against [defendant] at trial diminishes substantially."

Notwithstanding these possible benefits of further analysis of the can, applicable precedent holds that "[i]f . . . 'no more can be said [of the evidence] than that it *could have* been subjected to tests, the results of which *might have* exonerated the defendant,' " then the failure to preserve potentially useful evidence does not constitute a denial of due process of law unless " 'defendant can show bad faith on the part of the police.' " (*People v. Duff* (2014) 58 Cal.4th 527, 549.)  Defendant offers nothing to rebut the showing that the can was returned to the Honda's glove compartment after the fingerprint was lifted, and the Honda was subsequently returned to its owner with the can inside.  No bad faith has been demonstrated.  Therefore, the failure of the police to remove the can from the car before the car was returned to its owner did not constitute a violation of defendant's right to due process of law.

Defendant also contends that given the security features of the room in which the car was located, "loss or destruction would require an affirmative action on the part of the police to 'disappear' the item."  But the circumstance that the car was in a secured location does not mean that the return of the car to its owner with the can still inside the glove compartment was in bad faith.

Defendant further asserts that releasing the car containing the can despite the defense's specific request for the can "displays a conscious disregard for the preservation of the evidence."  It is not clear from the record when the car was released to its owner.  But even assuming it was released after the defense filed its motion for a discovery compliance order, that is not enough to demonstrate bad faith.  (See *Illinois v. Fisher* (2004) 540 U.S. 544, 548 [the existence of a pending discovery request does not eliminate the necessity of showing bad faith].)  Nor, contrary to defendant's assertion, is bad faith demonstrated by "the length of time

45

taken to disclose that the hairspray can was not available." The record indicates that the prosecutor promptly informed counsel when she learned the can was unavailable, and defendant points to no evidence that this information was known to the prosecution on any earlier date.

### 3. *Escape evidence*

Defendant contends that the trial court violated his right to due process and a fair trial by admitting evidence of his escape. We disagree.

Defendant was arrested in February 1996 for Friedman's murder. Over a year later, on March 12, 1997, he was indicted on two counts of first degree murder with several special circumstances. On May 31, 1997, defendant escaped from the North County Correctional Facility. He was arrested without incident the following night about 40 miles away in West Los Angeles, and charged with escape in a separate action. (§ 4532, subd. (b)(1).) Before trial, the prosecutor filed a motion to present evidence of defendant's escape to show his consciousness of guilt. At this time, the escape charge was trailing this case, and the two cases had not yet been joined. (See *post*, pt. II.D.2.a.*vi*.) Over defendant's objection, the trial court ruled that the evidence was relevant and its probative value was not substantially outweighed by the probability that its admission would necessitate undue consumption of time or create a substantial danger of undue prejudice, confuse the issues, or mislead the jury. (Evid. Code, § 352.)

Escape from jail pending trial is generally relevant to establish consciousness of guilt. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1126; *People v. Morris* (1991) 53 Cal.3d 152, 196.) Defendant's escape involved no threats, acts of violence, or other inflammatory features. Hence the trial court acted within its discretion in permitting the jury to consider it as consciousness of guilt regarding the other offenses. (See *Kipp*, at p. 1126 [the escape attempt involved no overt

46

violence and "would not so inflame the jurors' emotions as to interfere with their fair and dispassionate assessment of the evidence of defendant's guilt"].) Moreover, the trial court's standard flight instruction informed the jury that evidence of the escape was not sufficient alone to establish guilt. (See *post*, pt. II.B.6.a.)

### 4. *Spectator misconduct*

Defendant contends that the trial court erred in not declaring a mistrial on its own initiative when "the mothers of George Camacho and Allan Friedman repeatedly 'snickered' and made remarks in the presence of the jury." At sidebar and after the jury had been excused for a break during Anthony Morales's testimony, defense counsel said, "I would like either the prosecutor or the court to admonish the victim's mother, who has been snickering, that it has got to stop. She is right within . . . earshot of the jurors." Neither the court nor the prosecutor had heard anything. But the court accepted counsel's representation and admonished the audience, "Before we break for lunch, folks, those of you in the audience, you are not to react in any way to any testimony, any questions, either orally, physically, or any other way." After the lunch break, the court opened the proceedings by further admonishing the audience, "Before the jury comes in, folks, I understand that the medical examiner will be testifying this afternoon. I just want to make sure you know that in advance. You understand, I have to ensure that the jury does not see any emotional displays from either side. I'm not making any finding or anything like that, I just want you to know in advance that I can't allow the jury to see anything like that. So knowing in advance that that testimony's going to be coming, if it should be difficult for you, you might want to do whatever you think is appropriate, but I want[ed] to let you know it was coming

47

before the jury came in." The prosecutor said, "I've already told them, your honor, and advised them."

During defendant's testimony, the trial court interrupted the cross-examination and sent the jury out for a break. It then admonished the audience, "The people in the audience have been warned that if I hear or see any physical response from any testimony, that you will be asked to leave." The court then determined that Sandra Friedman, who was apparently related to murder victim Friedman, had made a sound during the cross-examination. It ordered her to leave the courtroom for the afternoon and said, "You are not to make any sounds, expressions, or anything else anywhere near any of the jurors. . . . Should you come back in the future, if I hear any sounds from you or anyone else, I will have the bailiff take them into custody. If anyone has any questions about that, just try it." At sidebar, the court then noted for the record that it had heard a snort and "immediately stopped the proceedings when [it] saw two jurors look in that direction." The court also noted that it "looked at both sides of the courtroom" when it admonished the audience "[t]o make it clear to both sides I have no intention of letting anyone say anything during the time the jury is in the courtroom." Both counsel had heard the sound, agreed with the court's response to it, and said in response to the court's inquiry that they did not wish the court to do anything further. The court asked the parties to inform it immediately if they heard of "any misconduct by any party."

At the end of the proceedings that same day, and outside the presence of the jury, the court admonished the audience again, "I am aware that this proceeding is very emotional for all parties concerned, whether you are here for either of the victims alleged or for the defendant. On Friday the attorneys will be arguing. Whether you agree or disagree with anything stated by either of the attorneys, you must understand that the jury cannot be allowed to observe any expressions, either

48

verbal or by body language, that may in any way affect their deliberations whether in this courtroom or anywhere in or near this courthouse. This is a public proceeding and you may all be present if you conduct yourselves appropriately only as observers. The bailiffs are instructed that anyone in the audience displaying any inappropriate comments, body language, sounds, noises, statements, will be cited for contempt and taken into custody. Folks, please, help me maintain the dignity of these proceedings."

Near the end of the guilt phase, and outside the presence of the jury, the court admonished the audience, "Ladies and gentlemen, it is my expectation that we will be getting to argument this morning. Whether you agree or disagree with any of the statements that are made by either of the attorneys, I will expect that there will be no outward shows of emotion, approval or disapproval. No sounds, noise, gestures. No facial gestures. No body language at all. The bailiffs have been instructed to watch the audience as well. Please, do not cause any incidents that will endanger this trial. If any of you feel that you are going to have a problem with maintaining the appropriate demeanor during the arguments of the attorneys, please, wait outside and do not cause us a problem later on. It may well be, and you should know in advance, you probably are not going to agree with everything that is said by both of the attorneys. Knowing that be forewarned."

Just before the guilt verdict was read, and outside the presence of the jury, the court admonished the audience, "I just want to remind those people in the audience that regardless of what the verdicts are, that there is to be no emotional showing here. There are bailiffs throughout the courtroom who will maintain proper conduct throughout these proceedings. So please keep that in mind, whatever the verdicts may be, I will expect those people in the audience to conduct themselves appropriately and with respect for these proceedings."

49

Because defendant never moved for a mistrial on the ground of spectator misconduct, he has forfeited this claim. (*People v. Chatman* (2006) 38 Cal.4th 344, 368 (*Chatman*) [the defendant may not argue on appeal "that the court should have granted a mistrial he did not request"].)

The claim is also meritless. Even assuming the trial court could declare a mistrial on its own initiative based on spectator misconduct, no basis for doing so appears here. "Spectator misconduct is a ground for mistrial if it is 'of such a character as to prejudice the defendant or influence the verdict,' " and the trial court has broad discretion in making this determination. (*Chatman*, *supra*, 38 Cal. 4th at pp. 368-369.)

Here the record reflects two instances of spectator misconduct, not, as defendant contends, "continual outbursts by the mothers." Indeed, the court went to great lengths to ensure proper courtroom decorum from the spectators. The first time defense counsel mentioned hearing snickering in the audience, the court accepted counsel's representation and immediately admonished the spectators. The court then repeatedly admonished the audience that although an emotional response to the testimony was to be expected, emotional displays would not be tolerated. When the court later heard an inappropriate sound, it immediately stopped the proceedings, admonished the audience, and excluded the offending spectator from the rest of the proceedings that day. Defendant fails to demonstrate that this response by the court was inadequate or that the sounds prejudiced defendant.

### 5. *Prosecutorial misconduct*

Defendant asserts that the prosecutor elicited false and misleading testimony from Detective Coblentz and failed to correct that testimony. We disagree.

As noted, in Greg Janson's statement to police, which was played for the jury, Janson said defendant had described a murder defendant had committed. (See *ante*, at pp. 7–8.) Many of the details in Janson's statement were similar to those in Woodland's trial testimony regarding Allan Friedman's murder.

During the defense case, Delia Chacon testified that she saw Janson at Perry's Auto Detailing about 10 times before and after Friedman's murder. She also testified that she kept a copy of the Friedman murder book (a collection of investigative reports) in the shop office, and anyone could go into the office and look at it. Delia frequently saw Janson in the office. (See *ante*, at pp. 15–16.)

On rebuttal, the prosecutor asked Detective Coblentz when Janson's statement had been "reduced to some type of police report." Detective Coblentz said February of 1996. The prosecutor then asked when Detective Coblentz had discussed Friedman's October 24, 1995 murder with Shane Woodland. Detective Coblentz replied, "That would have been February 10, 1997." The prosecutor asked, "And prior to that date had Mr. Woodland ever told you about his involvement in the murder of Allan Friedman?" Coblentz said, "No, [m]a'am."

The defense had received a copy of Woodland's taped interviews with police during discovery. Defendant was therefore aware at the time of Coblentz's rebuttal testimony that Coblentz had actually interviewed Woodland twice; once on January 30, 1997 and again on February 10, 1997. Defendant contends that the prosecutor's failure to correct Coblentz's "false" testimony meant the jury "was never made aware of the existence of the January 30th interview" or its favorable content.

"A prosecutor's presentation of knowingly false testimony [citation], or the failure to correct such testimony after it has been elicited (*Napue v. Illinois* (1959) 360 U.S. 264, 265–272), violates a defendant's right to due process of law under the United States Constitution." (*People v. Vines* (2011) 51 Cal.4th 830, 873.) In

51

*Napue v. Illinois*, on which defendant relies, the defense was not aware at the time of trial that the challenged testimony was false. (*Napue v. Illinois*, at pp. 265-267.) Here, because the defense knew Woodland's interview dates, the claim is forfeited by defendant's failure to object to Coblentz's testimony or to elicit the earlier date during Coblentz's cross-examination. (*People v. Marshall* (1996) 13 Cal.4th 799, 830–831.)

The claim is also meritless. Defendant does not explain how an acknowledgment by Detective Coblentz that Woodland's first interview occurred on January 30 and not February 10 would have informed the jury of the *content* of the January 30 interview. In the challenged line of questioning, it appears the prosecutor was simply establishing that Janson's statement had been reduced to writing about a year before Woodland's statement to police, so Janson could not have learned the details of the Friedman murder from Woodland's statement. That point was the same whether Woodland's first interview occurred on January 30 or February 10, 1997. No due process violation has been demonstrated.

### 6. Instructional issues

#### a. Flight

The trial court instructed the jury: "The flight of a person immediately after the commission of a crime or after he is accused of a crime is not sufficient in itself to establish his guilt . . . but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide." (See CALJIC No. 2.52.)

Here the evidence showed that defendant fled the scene of Friedman's murder and escaped from jail several months after being charged with Camacho's murder. "This is sufficient evidence to warrant instructing the jury to determine

whether flight occurred, and, if so, what weight to accord such flight. [Citation.] Moreover, the instruction given adequately conveyed the concept that if flight was found, the jury was permitted to consider alternative explanations for that flight other than defendant's consciousness of guilt." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.)

Contrary to defendant's assertion, the flight instruction is not duplicative of general instructions as to the definition and sufficiency of circumstantial evidence. (See CALJIC Nos. 2.00, 2.01, and 2.02.) Indeed, instruction in language substantially similar to that given here is statutorily required when the prosecution relies upon evidence of flight "as tending to show guilt." (§ 1127c.) The flight instruction properly allows " 'the jury to determine to which offenses, if any, the inference [of consciousness of guilt] should apply' " (*People v. Avila* (2009) 46 Cal.4th 680, 710) and "does not address the defendant's specific mental state at the time of the offenses" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1160). Nor is the flight instruction unfairly partisan and argumentative, or similar to the proposed defense instruction disapproved of in *People v. Mincey* (1992) 2 Cal.4th 408, 437, which "invited the jury to 'infer the existence of [the defendant's] version of the facts, rather than his theory of defense.' " (*People v. Nakahara* (2003) 30 Cal.4th 705, 713). Finally, the instruction does not "create an unconstitutional permissive inference or lessen the prosecutor's burden of proof." (*Avila*, at p. 710.)

### b. Accomplice instructions

Defendant contends that the trial court gave conflicting accomplice instructions. We conclude the error was not prejudicial.

The court instructed the jury in the language of CALJIC No. 3.16: "If the crime[] of murder as charged in count[] two of the indictment and robbery as

53

charged in count three of the indictment and the special allegations were committed by anyone, the witness, Shane Woodland, was an accomplice as a matter of law and his testimony is subject to the rule requiring corroboration." The court also instructed the jury in the language of CALJIC No. 3.19: "You must determine whether the witness, Shane Woodland, was an accomplice as I have defined that term. The burden of proof is proving by a preponderance of the evidence that Shane Woodland was an accomplice in the crimes charged against the defendant." The court thus gave conflicting instructions regarding Woodland's accomplice status.

Section 1111 provides that a "conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." An "accomplice" is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (*Ibid*.) "A witness is liable to prosecution within the meaning of section 1111 if he or she is a principal in the crime." (*People v. Hinton* (2006) 37 Cal.4th 839, 879.) A principal includes those who "directly commit the act constituting the offense" and those who "aid and abet in its commission." (§ 31.) "As we have explained, 'an aider and abettor's guilt "is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state." [Citation.]' (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) Establishing aider and abettor liability 'requires proof in three distinct areas: (a) the direct perpetrator's actus reus — a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea — knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus — conduct by the aider and abettor that in fact assists the achievement of the crime.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 146.)

54

Although the evidence was sufficient for the jury to find that Woodland was an accomplice, the evidence did not compel that finding as a matter of law. Woodland testified that he accompanied defendant to buy cocaine, saw defendant pull out a gun and cover it with a shirt as they drove to the exchange location, and helped defendant escape after Friedman's murder. However, Woodland also testified that he understood he and defendant were just going to pick up the drugs in exchange for the money and leave. He did not know there was going to be a drug "ripoff," did not know defendant intended to kill Friedman, and did not see defendant with a gun when defendant was speaking with Friedman. He further testified that when defendant returned to the car after shooting Friedman, he ordered Woodland to drive off and threatened to kill Woodland and his family if Woodland said anything. Janson told police that defendant said he and another person, a "kid," had planned to give the victim a kilo of cocaine in exchange for $25,000 or $35,000 and then shoot the victim and keep both the cocaine and the money.

Thus, the evidence of Woodland's knowledge of and intent to assist defendant in committing Friedman's robbery and murder was conflicting, and the jury was properly instructed to determine whether Woodland was an accomplice. (*People v. Gordon* (1973) 10 Cal.3d 460, 467 ["where the facts are in dispute as to the knowledge and intent of the asserted accomplice, the witness' liability for prosecution is a question of fact for the jury"]; see *Hinton*, *supra*, 37 Cal.4th at p. 880 [rejecting suggestion "that murder [is] a natural and probable consequence of any drug deal 'involving a large sum of money' "].) Because the issue of whether Woodland was an accomplice was for the jury to decide, defendant could not have been prejudiced by the court's conflicting instruction that Woodland, a witness adverse to defendant, was an accomplice as a matter of law. Rather, the

erroneous instruction could only have benefitted him by negating any import of Woodland's testimony unless corroborated (§ 1111).

### c. *Special circumstance allegation*

Defendant contends the trial court erroneously instructed the jury as to the special circumstance allegations that the murders were especially heinous, atrocious, or cruel, and seeks to have the true findings on these two allegations vacated. (§ 190.2, subd. (a)(14).) The Attorney General concedes the error.

The jury was instructed in the language of section 190.2, subdivision (a)(14): "To find the special circumstance referred to in this instruction as murder that was especially heinous, atrocious, or cruel, manifesting an exceptional depravity, the killing must be conscienceless or pitiless that was unnecessarily torturous to the victim. As used in this instruction, the phrase, 'especially [heinous], atrocious, or cruel manifesting exceptional depravity' means a conscienceless or pitiless crime that is unnecessarily torturous to the victim." We have previously concluded that this sentencing factor is unconstitutionally vague (*People v. Superior Court (Engert)* (1982) 31 Cal.3d 797, 801-803) and therefore vacate the true findings on the section 190.2, subdivision (a)(14) special circumstance allegations.

Nevertheless, defendant was not otherwise prejudiced because the jury would have heard the same evidence in support of the prosecutor's theories of murder and the special circumstance allegations of financial gain, robbery murder, and multiple murder that it heard in support of the two section 190.2, subdivision (a)(14) special circumstance allegations. In other words, giving the erroneous instruction did not change the underlying facts available for the jury to consider when it returned a death verdict at the penalty phase. (See *Brown v. Sanders* (2006) 546 U.S. 212, 220, 223–224; *People v. Bonilla* (2007) 41 Cal.4th 313, 334 [second special circumstance "was superfluous for purposes of death eligibility

56

and did not alter the universe of facts and circumstances to which the jury could accord . . . weight"].)

### C. Penalty Phase Issues

#### 1. *Constitutionality of the death penalty statute*

Defendant contends that California's death penalty statute is constitutionally invalid in numerous respects. We have repeatedly rejected similar claims, and defendant provides no persuasive reason to revisit our decisions. We thus reject his claims in accordance with the following precedent:

"[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court." (*People v. Dykes* (2009) 46 Cal.4th 731, 813.) We further "reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death." (*Ibid.*; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975-976, 978.)

"[T]he death penalty statute is not unconstitutional because it does not require 'unanimity as to the truth of aggravating circumstances, or findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence.' [Citation.] Nothing in *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, or *Apprendi v. New Jersey* (2000) 530 U.S. 466, affects our conclusions in this regard. [Citations.] No burden of proof is constitutionally required, nor is the trial court required to instruct the jury that there is no burden of proof. [Citations.]" (*People v. Dement* (2011) 53 Cal.4th 1, 55 (*Dement*).) "Written findings by the jury during the penalty phase are not constitutionally required, and their absence does not deprive

defendant of meaningful appellate review." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1097.)  The jury may properly consider a defendant's unadjudicated criminal activity.  (*People v. Martinez* (2010) 47 Cal.4th 911, 968.)  "Use of the adjectives 'extreme' and 'substantial' in section 190.3, factors (d) and (g) is constitutional."  (*Dement*, *supra*, 53 Cal.4th at p. 57.)  " ' "[T]he statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors.  [Citations.]" ' " (*People v. Parson* (2008) 44 Ca1.4th 332, 369.)

"The federal constitutional guarantees of due process and equal protection, and against cruel and unusual punishment [citations], do not require intercase proportionality review on appeal."  (*People v. Mai* (2013) 57 Cal.4th 986, 1057; see *Pulley v. Harris* (1984) 465 U.S. 37, 50–51.)  Moreover, "capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating" a defendant's right to equal protection of the laws, due process of law, or freedom from cruel and unusual punishment.  (*People v. Manriquez* (2005) 37 Cal.4th 547, 590; see *Dement*, *supra*, 53 Cal.4th at p. 56.)

Defendant contends that his death sentence violates international law and therefore his rights under the Eighth and Fourteenth Amendments to the federal Constitution.  He points to no authority that "prohibit[s] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements."  (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511 (*Hillhouse*).)

### 2. *Cumulative prejudice*

Defendant contends that the cumulative effect of guilt and penalty phase errors requires us to reverse the judgment.  We have found no error except for instruction on the section 190.2, subdivision (a)(14) special-circumstance

58

allegations, and with respect to this error as well as any error we have assumed, we have concluded there was no prejudice. We further conclude that this error and the assumed errors are not prejudicial when considered cumulatively.

### D. New Trial Motion

Defendant contends that trial counsel was ineffective at both the guilt and penalty phase and that the trial court erred in denying defendant's new trial motions asserting this claim. We disagree.

#### 1. Facts

On March 27, 1998, the jury returned its penalty verdict. On April 20, 1998, defendant filed a new trial motion asserting in part that defendant was denied the "effective assistance of co-counsel." In his declaration, Beswick stated, "I . . . feel that despite my efforts at providing a defense that had I had the aid of cocounsel, as I requested, that I would have been able to provide a better defense." In the notice of motion, defendant stated that his motion for second counsel was denied and, "consequently, defendant [*sic*] only met with the defendant . . . a few times prior to trial. It is the defendant's [*sic*] belief that this was insufficient for defendant to be prepared for, and adequately represented at, the trial of this matter."

On April 27, 1998, the day set for sentencing, Beswick informed the court that defendant wanted to relieve him as counsel and substitute William Pitman as his privately retained attorney. The trial court allowed the substitution, and Beswick gave Pitman his file.

On June 19, 1998, defendant filed a "Partial Motion for New Trial" asserting that Beswick had been ineffective at the penalty phase because he failed to meet with defendant more than twice before trial; failed to hire an investigator, forensic specialists, or a mental health expert; did not have an investigator or mental health

59

expert meet with defendant, investigate and present evidence on defendant's drug use, head injury, broken vertebrae, and mother's toxemia during defendant's birth; did not adequately interview and prepare penalty phase witnesses; and failed to deliver an adequate opening statement or closing argument. The motion was supported by Pitman's declaration, the unsigned declarations of defendant's mother, one of his sisters, and his estranged wife, copies of portions of the trial transcript, and a page of the new trial motion filed by Beswick. Defendant requested an evidentiary hearing on his claim. (See *People v. Fosselman* (1983) 33 Cal.3d 572, 582–583 (*Fosselman*).)

On August 3, 1998, defendant filed a "Motion for New Trial," asserting that Beswick had been ineffective at the guilt phase because he had met with defendant only twice before trial, had not hired an investigator, had not had an investigator interview witnesses before trial, had not interviewed any prosecution witnesses before trial, had not interviewed defense witnesses until just before calling them to the stand, had employed no forensic or other experts, had told the jury that anonymous callers had identified defendant as a suspect in the Friedman homicide, had failed to conduct an investigation into the backgrounds of Shane Woodland and Greg Janson in order to impeach them, had failed to investigate the backgrounds of Brian Skolfield and Michael Carranza, and had made unsupported assertions in his opening statement.

On September 17, 1998, Beswick and defendant filed declarations. Beswick's declaration stated that the investigator he used was Nationwide Fugitive Recovery.

Defendant's declaration, which was filed in support of the partial motion for new trial, stated that Beswick had visited him twice at jail and that both meetings lasted about five minutes. "[T]he only other times [he] spoke with [Beswick] were in the courthouse lockup during some of [defendant's] court appearances," and

60

those meetings were short and often no more than small talk. Beswick did not detail the charges against defendant and possible defenses, did not discuss in advance defendant's guilt or penalty phase testimony, did not describe what would happen at the penalty phase, and did not discuss trial strategy. He never reviewed the police reports with defendant and did not show him photographs or other evidence. Defendant never met with an investigator or a mental health expert, and Beswick did not obtain defendant's social history. Defendant did not testify at the evidentiary hearing.

The evidentiary hearing on the new trial motion began on September 17, 1998 and concluded on February 5, 1999, and spans eight volumes of the reporter's transcript. Defendant presented the testimony of Beswick, defendant's mother, sisters Leandra and Barbara, his now ex-wife Eva, and expert witness Carl Jones. The prosecution presented the testimony of Shane Woodland's attorney, Bruce Hill. The trial court granted the defense several continuances and considerable leeway in presenting evidence of counsel's deficiencies and any resulting prejudice. On the last day of the evidentiary hearing, the court said, "At this point you've been given every opportunity to make a record," and Pitman replied, "Yes."

Beswick testified that he had been a criminal defense attorney for nearly 20 years and had tried 25 to 50 felony cases. In the early 1990s, a number of his murder trials had involved complex gang issues. Beswick had never tried a death penalty case but had sat at counsel table and in the courtroom for part of the William Bonin death penalty trial in the early 1980s. Pitman had told Beswick that he (Pitman) had never tried a death penalty case either.

Beswick began representing defendant after the preliminary hearing in the superior court. He met with defendant on many occasions, most of which were in the courthouse lockup before or after court appearances or during trial. He also

61

met with defendant at jail on two occasions and "talked to him many times on the phone." He had numerous conversations with defendant about his trial testimony. Defendant already had the police reports for the Friedman murder, and Beswick gave him those for the Camacho murder. Defendant would not talk to Beswick about the penalty phase until after he was convicted.

Before trial, Beswick interviewed prosecution witnesses Greg Janson and Hugo Saavedra. The interview with Janson lasted about an hour. He also interviewed each of the witnesses who testified for the defense. Beswick did not attempt to obtain the employment records of Janson, Anthony Morales, or Efrain Bermudez, or those of any other dairy employee. He spoke with defendant's family about defendant and the case numerous times during the trial, and he interviewed defendant's mother, stepfather, two sisters, and his wife Eva at various times. These included an interview with defendant's sister Leandra before the trial and interview with his mother during the trial.

Beswick did not take copious notes of his interviews of defendant or Delia Chacon because of "[i]ncriminating evidence against" defendant. Beswick also did not take notes of his interviews with witnesses because he would be required to produce them to the prosecution under section 1054. This was a tactic used by many defense attorneys.

Mark Garrelts at Nationwide Fugitive Recovery performed investigative work, including locating two witnesses, Michael Carranza and Brian Skolfield. Defendant was given $1,500 in investigative funds by the court for this purpose, but the funds were not provided directly to Beswick. In Beswick's view, it was not in defendant's best interests to produce Brian Skolfield at trial. Rather, it was in his best interests to have the jury wonder where Skolfield was.

Beswick did not employ a fingerprint expert or any other kind of forensic expert. Had there been any blood or DNA evidence, he would have employed an expert to examine that evidence.

Beswick was aware that Shane Woodland had a juvenile record but did not petition the court to obtain that record. Nor did he attempt to obtain any dependency files or school records related to Woodland. Beswick had Woodland's arrest record, statements to police, and probation reports and police reports involving Woodland. On cross-examination, Beswick agreed with the prosecutor that he had elicited the fact that Woodland was given a deal in exchange for his testimony and also had a relationship with Delia Chacon.

During the guilt phase, Beswick presented a defense to the Camacho murder that Skolfield, not defendant, was the killer, and that defendant was a "good guy" who could not have killed Camacho. As to the Friedman murder, Beswick put on those eyewitnesses who were unable to identify defendant. When Pitman noted that Beswick's declaration in support of the new trial motion stated that he believed he had provided inadequate representation, Beswick replied, "He was found guilty, so the answer is yes."

As to the penalty phase, Beswick was aware that defendant had used drugs on a consistent basis at one time and that he had used PCP. At the guilt phase, defendant testified that he had abused drugs but had beaten the habit. Defendant told Beswick he had started using drugs in his twenties and did so consistently, and that he had used PCP, but told Beswick he had not used drugs in a long time and his drug use was over. Defendant did not want to be examined or have his records obtained and did not want his drug use brought up. Defendant said to Beswick that "if he went to the penalty phase and disclosed his drug use, he would then be basically contradicting himself and his testimony at the guilt phase of the trial. So he told me he didn't want anything brought up about his drug use."

63

Defendant was concerned because he had testified at the guilt phase he had not committed the murders, and if the defense asserted at the penalty phase that he committed the murders "because of his past drug use, it would impeach his credibility." Beswick told defendant he "wanted to do it," and he "thought we should do it," but defendant said, "No. Absolutely don't." Beswick did not consult with a substance abuse expert or medical professional as to the effect the drugs could have had on defendant because "strategically he didn't want that brought up at the penalty phase."

Beswick testified that, in his view, there was no need to have defendant examined by a neurologist, nor would it have been beneficial to the defense to employ a social worker. It "could have been" useful at the penalty phase to have defendant examined by a psychiatrist or a psychologist. But none of the family members testified that defendant had a psychological problem, and Beswick recalled that defendant said he had not received any mental health treatment in the past. Beswick did not request that the court appoint a mental health expert to examine defendant, consult with a mental health expert for the penalty phase, or have defendant examined by such an expert.

The only injury defendant mentioned to Beswick was his 1987 head injury. According to a defense exhibit shown to Beswick during his testimony, defendant had suffered "strain and sprains," was given Motrin, and was told to attend physical therapy five times a week. Also, according to this document, which appeared to be part of a worker's compensation case, the accident occurred on October 5, 1987, the treatment date was October 30, 1987, and the treatment occurred at an office, not in a hospital.

Beswick did not call Delia Chacon as a witness at the penalty phase because defendant had impeached her testimony by testifying that they were just friends when Delia had testified that she and defendant were more than just friends.

Beswick frequently spoke with defendant's family about defendant and his case during the trial. Defendant instructed Beswick not to contact his oldest daughter at UCLA because she was in finals. Defendant kept her sheltered from the severity of the charges against him; at defendant's instruction, Beswick did not meet with her. Beswick was also asked not to interview defendant's other children.

At trial, the dairy gave both parties a 1990 memo by defendant's supervisor, Harry Holton, that discussed defendant's drug problem and said defendant had denied he had a substance abuse problem. For this reason, Beswick testified he thought it was not in defendant's best interest to introduce the memo. Beswick did not have defendant "prepare a release" for personnel or medical records, did not have an investigator obtain defendant's medical records, and did not contact defendant's high school or the Los Angeles Unified School District to obtain his academic records. He did not obtain defendant's medical, substance abuse, or mental health records, or his mother's hospital records concerning defendant's birth. Beswick contacted the Ross Swiss Dairy but did not obtain defendant's personnel file. Beswick did not employ forensic experts, criminalists, medical doctors, mental health experts, social workers, or mitigation experts.

Carl Jones, a criminal defense attorney, testified as an expert on the effective defense of death penalty cases. He was present for Beswick's testimony at the evidentiary hearing and had reviewed the trial transcripts other than jury selection, the filed posttrial motions including defendant's declaration, defendant's employment records addressing his inpatient and outpatient drug treatment, employment and industrial accident/worker's compensation records regarding a head injury defendant had sustained, and Beswick's declarations filed in support of defendant's motions for funding, second counsel, and Beswick's appointment. Based on these materials, Jones opined that Beswick's penalty phase

representation was ineffective. Jones was not retained to examine Beswick's performance at the guilt phase and did not examine that performance. Jones did not know the content of defendant's conversations with Beswick.

Martha Heredia, defendant's mother, testified that she attended the entire trial. Beswick never gave her specific information about the case or asked her anything about defendant's childhood or background during the guilt phase. Beswick told Martha he was going to put her on the stand at the penalty phase 15 minutes before she testified. It was then they discussed defendant's background and childhood. Beswick also told her "not to get emotional and not to seek . . . sympathy from the jury," "that we were sorry they lost their sons," or that defendant "was innocent."

Martha was not planning to attend court the day she testified in the penalty phase, and it was "just luck" she was there. On cross-examination, she denied that Beswick called her and told her the verdicts had been rendered and would be read at 10:00 a.m. the following day. She said it was merely a coincidence that her two daughters and daughter-in-law were also there.

Martha further testified that defendant had an older brother, Ricardo, and three sisters. Ricardo was never contacted by the defense. Defendant's father died from a heart attack at the age of 36. Defendant was very close to his father and, after his death, was very depressed but had a "crazy personality" so "he kept the other kids' spirits up."

Martha married Robert Heredia three years later, in 1970, when defendant was 13 years old. Heredia was an alcoholic and verbally abusive. He did not hit Martha but "shoved [her] around" in front of defendant. The atmosphere at home was tense because they never knew if Heredia would come home in a good or bad mood. The children used to hide from him. Martha told Heredia to move out 15 years ago, and Heredia successfully stopped drinking. On cross-examination,

66

Martha said that Heredia and defendant worked together at the dairy and appeared to get along. She did not tell Beswick that Heredia was volatile in front of defendant.

Martha also testified that when she was pregnant with defendant, she developed toxemia and experienced high blood pressure and swelling. As she was giving birth, she went into convulsions. Beswick did not ask her for information about defendant's birth. On cross-examination, Martha testified that defendant was kept only one day in the hospital after his birth, and then she took him home. She was not told by a doctor that defendant was sick in any way.

When defendant was four years old, he fell headfirst off a chair and broke a vertebrae in his neck. He was placed in traction and hospitalized for two weeks. He later played baseball and Pop Warner football.

At some point, defendant hurt his head while working at B&H Towing. Martha learned of the injury when defendant visited Martha and "his whole head was swollen." Defendant was given "a plastic insert that had to be worn because of the jaw." She did not know whether defendant was ever hospitalized as a result of the accident; she did not visit him in a hospital.

Martha testified that defendant moved back in with her when he "got on drugs." He would get upset easily and believed he was being followed and spied on. On cross-examination, Martha said she knew defendant was taking drugs because of the "way he acted sometimes." Martha saw defendant act this way two or three times during his childhood and as an adult. Martha never saw drugs in the house, and she had no experience with individuals who were under the influence of drugs or alcohol. Martha further testified that defendant never told her he was taking drugs. But she also said at some point after defendant moved out, he came home "acting really crazy one day" and said "he had taken something" but did not tell her what he was on.

Martha did not tell Beswick about the head injury, toxemia, vertebrae fracture, the stepfather's abusive alcoholism, or the full extent of defendant's drug use. She said the only time she "really" spoke to Beswick about "these issues," apparently referring to issues other than the head injury and toxemia, was in the 15 minutes before she testified at the penalty phase. On cross-examination, she agreed with the prosecutor that she waited for Beswick each day after trial and walked with him to the elevator. On those occasions when Beswick did not visit with defendant, Martha also spoke with Beswick outside the courthouse. At times she spoke with him after he met with defendant.

Leandra Kamba, defendant's younger sister, testified that she had known Beswick for about 10 years because he shared a suite with an attorney for whom she worked as a legal secretary. About a year after Beswick started representing defendant, Kamba moved to a different floor, but she still occasionally saw Beswick. When she asked Beswick about defendant's case, he would tell her "basic things about the case," such as "Greg Janson . . . would be a problem." Beswick never asked about defendant's background or family life. On about half the occasions that she attended the trial, she spoke to Beswick for about 5 to 10 minutes after the proceedings had ended for the day about how the trial was going and who would be called next as a witness. On about 10 occasions, she and her mother and sisters spoke with Beswick about the trial, and on other occasions, she saw Beswick speaking with other family members. Beswick never discussed the penalty phase with her.

Kamba came to court the day she testified in the penalty phase because her mother had called her the day before to tell her that the verdicts were in. Beswick had notified her mother about the verdicts. Kamba did not know before then that Beswick wanted to call her as a witness. Beswick asked her and her family during lunch that day about defendant's drug problem. The family told defendant's

68

oldest daughter about the verdicts about a month after they were returned because they "didn't want to upset her."

Defendant looked out for Kamba when she was a child and was kind to the other children in the neighborhood. Although Beswick had told her not to get emotional during her penalty phase testimony, Kamba agreed with the prosecutor that she had cried and told the jury defendant was a loving person. She tried to impart to the jury her belief that defendant was a good person.

Eva Carrasco testified that she married defendant in 1980, and they were divorced in December 1998. She met defendant in 1972 and they started dating in 1975.

On the morning of the day Eva testified at the guilt phase, defendant's sister Kamba called her and said Beswick would probably need her to be at the courthouse. Eva and Beswick spoke about 10 minutes before her testimony, and Beswick explained he was just going to ask her if she and defendant knew Greg Janson. On the day of the guilt verdicts, Beswick spoke with Eva and other family members for 45 minutes to an hour and said he would ask questions about what kind of a husband and father defendant had been. Beswick did not ask about defendant's background or what kind of problems he had experienced.

Eva was aware that defendant was using drugs because he was normally joyful with a good sense of humor, but when he was under the influence, he was grumpy and paranoid and at times hallucinated. When they were younger, defendant had used PCP. More recently, he had used cocaine or crack. Defendant had a significant drug problem and used drugs throughout the marriage. His drug use was the reason for their separation and eventual divorce. More than 10 times, Eva had to leave their home with the children because of defendant's behavior. Eva never described defendant's paranoid behavior to Beswick. She told Beswick just before she testified that defendant's drug use was the reason for the divorce,

69

and Beswick replied, "Well, we don't need to get into that in court." Eva recalled that defendant had been in one drug rehabilitation program about 10 years earlier for three or four months. After that time, defendant was drug-free.

Barbara Carrasco-Gamboa, defendant's sister, testified that she was one and a half years older than defendant. She described once seeing defendant when he was about 21 years old apparently high on drugs and learned later from her sisters that defendant was using PCP. She did not discuss defendant's drug history with Beswick but did discuss their family life when they were growing up. Before the day Barbara testified, she had not had any contact with Beswick concerning her penalty phase testimony. After their father died, defendant became somewhat withdrawn and spent more time out with his friends. The stepfather hit Barbara, and the police were called. Defendant did not witness this event, and Barbara did not know if the stepfather also hit defendant. In her view, defendant neglected his family during the 10-year period he abused drugs because he was "always helping all these young guys out" and not spending enough time with his daughters.

Bruce Hill testified as a prosecution expert on the defense of death penalty cases. Hill represented Shane Woodland who was originally defendant's codefendant. Hill did not always use an investigator in death penalty cases and did not use an investigator in this case, but did benefit from minor work done by an investigator involved before Hill represented Woodland. Hill had been involved in about 20 death penalty cases and had only had a second attorney in two of those cases. Woodland's left thumbprint was found on Friedman's passenger door; Hill did not have the thumbprint retested. Hill did not obtain a copy of the videotape of Woodland's interview with police. Hill would not have presented evidence of defendant's drug history to the jury, explaining that in his view "[a]n attorney loses credibility when he attempts to convince a jury to show mercy predicated on factors which are not meaningful to the jury."

70

The trial court denied the new trial motions, stating, "Having heard the entire trial, I'm satisfied that [the] [re]presentation of Mr. Beswick was competent, that he was prepared for each witness. He thoroughly cross-examined each witness, he called the witnesses that he felt were appropriate. I did not find that his performance was below the standard that is required."

### 2. Discussion

Usually, ineffective assistance of counsel claims are properly decided in a habeas corpus proceeding rather than on appeal. (*People v. Tello* (1997) 15 Cal.4th 264, 266-267 (*Tello*).) For this reason, "the rules generally prohibiting raising an issue on habeas corpus that was, or could have been, raised on appeal [citations] would not bar an ineffective assistance claim on habeas corpus." (*Id*. at p. 267.)

We have also explained that "the trial court should consider a claim of ineffective assistance of counsel in a motion for new trial" when the " 'issue of counsel's effectiveness can be resolved promptly at the trial level' " and justice will be thereby be expedited. (*People v. Cornwell* (2005) 37 Cal. 4th 50, 101 (*Cornwell*).) "But our assumption has been that courts would decide such claims in the context of a motion for new trial when the court's own observation of the trial would supply a basis for the court to act expeditiously on the motion. . . . 'It is undeniable that trial judges are particularly well suited to *observe courtroom performance* and to rule on the adequacy of counsel in criminal cases tried before them. [Citation.] Thus, in appropriate circumstances justice will be expedited by avoiding appellate review, or habeas corpus proceedings, in favor of presenting the issue of counsel's effectiveness to the trial court as the basis of a motion for new trial. If the court is *able* to determine the effectiveness issue on such motion, it should do so.' " (*Ibid*.)

In *Fosselman*, *supra*, 33 Cal.3d 572, the prosecutor committed misconduct during trial that was observed by the trial court. (*Id.* at pp. 579–580.) We concluded that, in that circumstance, justice would be expedited by having the trial court that had witnessed the misconduct rule on whether counsel was ineffective in failing to object. (*Id.* at pp. 582–583.) By contrast, in *Cornwell*, we held that the trial court acted within its discretion in concluding the claim could not be readily resolved but rather should be litigated in a habeas corpus proceeding. (*Cornwell*, *supra*, 37 Cal.4th at p. 101.) The matter in *Cornwell* "would have been delayed for at least six months while substitute counsel examined trial counsel's case records and performed additional investigation concerning witnesses who did not appear at trial and evidence that was not in the record, in order to decide whether to make a motion for new trial." (*Ibid.*) Here, too, resolution of defendant's posttrial ineffective assistance of counsel claim "rested primarily upon matters other than what the trial court could have observed during trial" (*ibid.*), and the court would have acted well within its discretion, and saved considerable resources, had it concluded the claim should be litigated in a habeas corpus proceeding.

A defendant who appeals from the denial of a new trial motion generally forfeits those claims not raised in the new trial motion. (*Verdugo*, *supra*, 50 Cal.4th at p. 309.) Here, however, defendant claims that counsel was ineffective at the guilt and penalty phases, and that the trial court erred in denying his new trial motions made on this ground. In general, a defendant is not required to raise claims of ineffective assistance of counsel in the trial court before raising them on appeal. (See *Fosselman*, *supra*, 33 Cal.3d at p. 581.) In any event, because we conclude that none of defendant's claims of ineffective assistance of counsel can succeed on the record before us, we need not decide which claims he raises in this court were raised in the trial court, nor need we resolve whether a

72

defendant who receives an evidentiary hearing on his new trial motion asserting ineffective assistance of counsel is limited on appeal to those claims raised in his new trial motion.

"When the basis of a challenge to the validity of a judgment is constitutionally ineffective assistance by trial counsel, the petitioner must establish either:  (1) As a result of counsel's performance, the prosecution's case was not subjected to meaningful adversarial testing, in which case there is a presumption that the result is unreliable and prejudice need not be affirmatively shown [citations]; or (2) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome." (*In re Visciotti* (1996) 14 Cal.4th 325, 351–352.)  At both the guilt and the penalty phases, a " 'reasonable probability is defined as one that undermines confidence in the verdict.' " (*In re Hardy* (2007) 41 Cal.4th 977, 1032.)  Our precedent holds " 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' " (*Tello*, *supra*, 15 Cal.4th at p. 266.)  Further, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 688, 697.)

### a. Guilt phase

#### i. Defendant and his family

Defendant contends that trial counsel failed to "reasonably interview" defendant or his family. Beswick testified that he met with defendant on many occasions, most of which were in the courthouse lockup before or after court appearances or during trial. He met with defendant at jail on two occasions and "talked to him many times on the phone." He had numerous conversations with defendant about his trial testimony. When Beswick was asked if there was a reason he did not visit defendant at the jail from which defendant escaped, Beswick said, "Yes," but explained that the answer was privileged. Moreover, at trial, Beswick presented a defense that was consistent with defendant's testimony regarding both murders, including introducing evidence on Friedman's murder that Shane Woodland's two brothers also worked at Perry's Auto Body Detail and that prosecution eyewitness Hugo Saavedra had described the perpetrators as "look[ing] like brothers" and picked Shane Woodland's brother Ryan out of a photographic lineup, saying "I think" this individual was Woodland's passenger and accomplice. (Woodland had light-colored hair and a light complexion and was 17 years old at the time of the Friedman killing. Defendant is Hispanic with black hair and was about 38 years old at the time of Friedman's death.) This record does not establish, as defendant contends, that counsel "never engaged in comprehensive conversations with his client about the case." Defendant did not testify at the evidentiary hearing, and assuming we can consider the statements in defendant's declaration that Beswick did not detail the charges against him or the possible defenses or discuss in advance defendant's guilt phase testimony, the trial court implicitly credited Beswick's testimony in denying the new trial motion.

74

Defendant contends that had Beswick interviewed defendant further, "he would have been able to effectively impeach" Greg Janson, whom defendant claims "provided the only link between the accused and the offenses for which he was convicted." This is so, he claims, because other dairy employees were familiar with Janson's mental problems and his involvement in Camacho's murder, and because there were "records available from [Janson's] personnel file." But defendant was also linked to the crimes by his statements to several other individuals and by the testimony of his coperpetrator Shane Woodland. In addition, Janson acknowledged on cross-examination that he was taking Prozac and Klonopin at the time of his statement to police, and that he had been prescribed these drugs because he had experienced depression and anxiety attacks. Defendant fails to explain what other information he was unable to share with counsel that would have further impeached Janson. Likewise, defendant summarily asserts that he could have "identified witnesses who would testify as to Anthony Morales' hostility towards him" and could have given counsel the "names of witnesses to support the defense theory" that Camacho was a "known drug dealer who was murdered . . . in connection with his drug dealings." But defendant presented no such evidence at the evidentiary hearing.

Defendant further claims that he had information that Shane Woodland "lived and worked with drug dealer Javier Chacon" and that when "Chacon discovered [defendant] was having an affair with his wife, he arranged for Woodland to pin Friedman's murder" on defendant. But this information was introduced at trial. Indeed, defendant testified that he believed Woodland was lying for Chacon and that a week before Woodland's testimony that defendant committed the murder, Chacon had told defendant that he thought defendant was "with his wife and that he's going to have [Woodland] say this." At the

75

evidentiary hearing, defendant presented no further evidence that would have bolstered this defense.

Defendant also contends trial counsel was ineffective for failing to "reasonably interview" defendant's family.  But he does not explain how his family would have assisted in his guilt phase defense.  In any event, Beswick testified that he spoke with defendant's family about defendant and the case numerous times during the trial.

### ii.    Other defense witnesses

Defendant contends trial counsel was ineffective for failing to "interview witnesses, hire experts, or conduct any investigation whatsoever for the guilt phase."  He contends that Beswick interviewed defense witnesses briefly and "only minutes before having them testify."  He does not identify which defense witnesses he claims were inadequately interviewed or what information was not uncovered by Beswick.  Nor did he present any such evidence at the evidentiary hearing.

Defendant asserts that the only discovery Beswick provided to the prosecution concerned the names of two witnesses and did not include "any report, identifying information, or summary of expected testimony."  Beswick testified that he deliberately avoided taking notes to minimize the discovery he would be required to turn over to the prosecution.  In light of this tactic, it is unclear how the production of little discovery demonstrates, as defendant asserts, "a shocking lack of activity on the part of the defense attorney to prepare" for trial.

Defendant also asserts that "there was no investigator working on the case." Beswick testified that he used an investigation service to locate Skolfield and Carranza, but did not otherwise use an investigator. But defendant does not identify what information Beswick might have uncovered had he used further investigative services.

Defendant contends that Beswick "hired no experts for the guilt phase," such as a criminalist or a mental health expert. But he does not explain how such experts would have aided the defense. In particular, it is unclear how a mental health defense would have helped his alibi defense for the Friedman murder and his testimony that he witnessed someone else kill Camacho.

Defendant also contends that "[d]espite promising in the opening statement that he would demonstrate that [Camacho] was a drug dealer, the defense attorney never attempted to corroborate this assertion." Defendant asserts that Beswick never obtained or attempted to obtain Camacho's employee, union, medical, or drug treatment records in order to prove the claim. But defendant fails to identify what information was available, nor did he introduce any such evidence at the evidentiary hearing.

Defendant also contends that before trial began, Beswick "falsely claimed" Michael Carranza would implicate Skolfield in Camacho's murder, noting that at trial Carranza invoked his Fifth Amendment privilege against self-incrimination when called to testify. At the pretrial hearing, Beswick informed the court that he was attempting to locate Skolfield but that he had a witness (Carranza) who saw Skolfield shoot Camacho. When the court suggested that if Skolfield was called as a witness, the court would "need to have another attorney in there for that," Beswick said, "I definitely think that's in order . . . in either one of them . . . for sure." Thus, Beswick anticipated that Carranza might be appointed counsel to advise him and did not promise Carranza would testify. In any event, it is not

77

clear how Carranza's invocation of a privilege falsifies Beswick's claim that Carranza saw Skolfield shoot Camacho.

### iii. Prosecution witnesses

Defendant asserts that counsel "did not subpoena or interview a single prosecution witness." But Beswick testified that before trial he interviewed prosecution witnesses including Greg Janson and Hugo Saavedra.

### iv. Greg Janson tape

Defendant contends that Beswick was ineffective for failing to object to the playing of Janson's taped statement to police because it contained inadmissible statements. But Beswick did successfully object to the playing of Janson's tape both before and during Janson's direct testimony. On cross-examination, Janson was impeached by numerous prior inconsistent statements at the preliminary hearing and before the grand jury. On redirect, the prosecutor was permitted to play the tape without objection as evidence of Janson's prior consistent statements. (Evid. Code, §§ 791, 1236.)

No deficiency in failing to object to portions of the tape has been demonstrated. "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*Hillhouse*, *supra*, 27 Cal.4th at p. 502.) The record does not reveal why Beswick did not object to the challenged portions of the tape, and he was not asked to provide a reason at the evidentiary hearing. Moreover, defendant fails to demonstrate he was prejudiced by admission of the entire tape. Statements that defendant carried a gun at the dairy and that others at the dairy were afraid of defendant were cumulative to the similar testimony of Nunez, Bermudez, and Morales. Likewise, to the extent the jury understood the interviewer's questions on the tape to mean anonymous calls had been received by police implicating defendant, defense counsel had already

informed the jury of these calls in his opening statement, and the evidence was consistent with the defense that defendant was framed.

### v. Shane Woodland tape

Defendant contends that trial counsel was ineffective for failing to impeach Shane Woodland with prior inconsistent statements in his taped statements to police. But the record does not reveal why Beswick did not use the statements in cross-examining Woodland, he was not asked to provide a reason at the evidentiary hearing, and the matter is not one for which there could be no satisfactory explanation for counsel's conduct. (*People v. Cleveland* (2004) 32 Cal.4th 704, 746 ["[N]ormally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make"].) Indeed, on the tape, which was not introduced at trial, the interviewing officer described defendant as a person who dealt drugs in "large quantities," Woodland acknowledged he knew defendant was a drug dealer, and Woodland stated that defense witness Delia Chacon used drugs to calm herself. Defense counsel may have concluded that the tape's value in impeaching Woodland's testimony by demonstrating he had initially denied seeing defendant with a gun before the murder and with a bag after the murder was outweighed by the damage it could have caused to defendant's and Delia's credibility.

### vi. Motion to join

Defendant contends that trial counsel was ineffective because his motion to join the escape charge with the murder charges was prejudicial and lacked any tactical basis. We have concluded that the trial court did not abuse its discretion in admitting evidence of the escape to establish defendant's consciousness of guilt. (See *ante*, pt. II.B.3.) After the trial court ruled evidence of the escape would be admissible, defense counsel suggested, and defendant personally agreed to, trying

79

the escape charge with the murder counts. The prosecutor noted that although she was prepared to present the escape evidence, she would do so more extensively in a trial on that charge. Defendant testified at length about his months of carefully planning the escape, and defense counsel used that testimony to argue to the jury that defendant would not have killed the victims in a rash or public manner. The joinder motion thus does not indicate defense counsel's ineffectiveness, and no evidence supports defendant's assertion that defense counsel suggested joining the escape charge "so that he could shorten the time devoted to defending [defendant] and move on to revenue producing clients."

*vii. Defense theory*

Defendant contends that trial counsel was ineffective for mentioning unsubstantiated theories in his opening statement that were neither investigated nor corroborated.

During his opening statement, defense counsel said that murder victim Camacho was "in the drug business" at the time of his death. The prosecutor objected, and at sidebar defense counsel said his argument was that Camacho was a drug dealer and "[m]any people could have wanted him dead." Noting that Camacho was carrying two and one-half grams of cocaine when he was killed, counsel said he planned to ask an officer his opinion whether this constituted possession for sale. Counsel also said he would present the testimony of defendant, and "hope[fully]" that of Harry Holton and Greg Janson, to say Camacho was in the drug business. The prosecutor objected that she had received no discovery as to defendant's statements to this effect. The court accepted counsel's representation that these individuals would testify that Camacho was in the drug business at the time of his death and allowed defense counsel to continue presenting this theory in his opening statement. Defense counsel then told the

80

jury, "There's going to be evidence brought out in this trial that [Camacho's] involved with drugs as well. He uses them. He sells them." The court instructed the jury that "[a]n opening statement is not evidence."

A pathologist testified that Camacho's blood contained .38 micrograms of methamphetamine at the time of death. Defendant testified that, as shop steward, he knew Camacho had a drug problem. Defendant was upset that the union representative had rejected defendant's suggestion that Camacho be required to attend a drug therapy program as a condition for returning to work.

Ineffective assistance of counsel is not demonstrated simply because the evidence at trial does not mirror counsel's opening statement. "Forgoing the presentation of testimony or evidence promised in an opening statement can be a reasonable tactical decision, depending on the circumstances of the case." (*People v. Stanley* (2006) 39 Cal.4th 913, 955.) Beswick was not asked at the evidentiary hearing about his theory that Camacho was selling drugs, so we have no information explaining why such evidence was not introduced at trial.

Defendant also claims that Beswick's comments during his opening statement that the "union went to bat" for Camacho and that defendant was "a union steward" and was "involved in that battle" were deficient because Beswick then "failed to introduce evidence supporting the statement." As noted, defendant testified that he "came forward for" Camacho by approaching the union representative and suggesting that Camacho get his job back on the condition he attend a drug therapy or counseling program. Defendant testified he was concerned that if Camacho did not attend the drug program, which would apparently protect his job, he would simply be fired again if he made any mistake. No ineffective assistance of counsel has been demonstrated.

81

### viii. Anonymous calls

Defendant contends that trial counsel was ineffective for telling the jury in his opening statement that anonymous calls to police identified defendant as Friedman's killer. In his opening statement, Beswick described Shane Woodland's deal with the prosecution and said, "Now, after this occurs the police then about a week after the shooting they get this phone call from who they don't know, from where they don't know and from why they don't know that says 'Hey, we know who shot Allan Friedman. . . . [H]is name is Humberto. And Javier Chacon, Sr., supplied him with drugs. He's the guy that did it.' . . . That doesn't work. So a couple months later they call again because [defendant] hasn't been arrested . . . . saying 'His name is Bert Carrasco. This is what he looks like. He's the guy that did it.' Anonymous. We don't know who did it, where they came from or why they did it. They just call."

Defense counsel's opening statement was consistent with the defense theory that defendant was framed and that no reliable evidence supported a conviction. No deficient performance has been demonstrated.

### ix. Fingerprint expert

Defendant contends that trial counsel was ineffective for failing to retain a fingerprint expert. No evidence was introduced at the evidentiary hearing as to what such an expert would have found.

Defendant also contends that counsel was deficient in stipulating that the latent print on the hairspray can in Woodland's car belonged to defendant without first consulting a fingerprint expert. Actually, defense counsel simply stipulated that a rolled impression that was compared to the latent print was defendant's fingerprint.

Defendant further contends that Beswick should have called as a witness Michael Ames, the technician who dusted the victim's Jeep for fingerprints. The decision whether to call certain witnesses is a "matter[] of trial tactics and strategy which a reviewing court generally may not second-guess." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059 (*Mitcham*).) Counsel elicited from Charles Caudell, the prosecution's witness who dusted Shane Woodland's car for fingerprints, that Woodland's, but not defendant's, prints were found on the outside of the passenger door of the victim's Jeep. That Caudell could not answer further questions, such as whether Ames had dusted other parts of the car, does not demonstrate that counsel was deficient. At the evidentiary hearing, defendant did not introduce any evidence as to what Ames's testimony might have revealed, and Beswick was not asked why he did not call Ames. It is possible Beswick wanted the jury to wonder about the questions Caudell could not answer without having them definitively resolved by Ames.

### x. Police reports

Defendant contends that trial counsel was ineffective for preventing defendant from reading the extensive police investigative reports. He relies on a hearing during jury selection in which the prosecutor observed defendant reading juror questionnaires. The trial court admonished counsel not to allow defendant to see the questionnaires. Shortly thereafter, the trial court asked if defendant was reading the "murder book." Counsel replied that defendant was reading his file. The court said it wanted to "make sure that there are no names and addresses or phone numbers of any witnesses or relatives of victims" and admonished counsel to "make sure you excise appropriate portions if you're going to let him look at it." Counsel said, "I'll take everything away from him. I don't want to get into that. I'm sure I have, but just to make sure, I'll take the book away from him."

Based on this exchange, defendant asserts that counsel "made the decision to deny his client any access to discovery" during trial, rendering defendant unable "to participate in any meaningful way in his own defense." But the above exchange merely reveals that counsel took materials from defendant that day in court, not that he precluded defendant from ever seeing any properly redacted investigative materials during trial. Beswick testified at the evidentiary hearing that when he was retained, he gave defendant the Camacho police reports and that defendant already had the Friedman police reports. Beswick was not asked about other investigative materials, and defendant introduced no other evidence that he was denied access to investigative materials. Thus, even assuming defendant was entitled to see the murder book or other investigative materials, no deficient performance has been demonstrated.

### xi. Closing Argument

Defendant contends that trial counsel was ineffective for repeatedly referring to prosecution witness Andrew Nunez as Anthony Morales during closing statement. Defendant cites to one page of the transcript in which Beswick asserts that Morales testified that defendant said he made $9,000 a month performing body work on cars (when, in fact, Nunez testified to this statement) and a few sentences later said, "Morales was wrong." There is no reasonable probability that this minor error prejudiced defendant.

### xii. Alibi instruction

At oral argument, and in his subsequent supplemental reply brief concerning a different issue (see *ante*, pt. II.B.5.), defendant asserts that trial counsel was ineffective for failing to request an alibi instruction. This claim is forfeited. "Obvious reasons of fairness militate against consideration of an issue raised initially" at oral argument. (*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285,

295, fn. 11 [issue first raised in reply brief].) Contrary to defendant's assertion, raising a claim of ineffective assistance of counsel in an opening brief on appeal does not entitle a defendant to assert at oral argument or in a supplemental reply brief new theories as to how counsel was purportedly ineffective.

The claim is also meritless. Beswick was not asked at the evidentiary hearing why he had not requested an alibi instruction, and the matter is not one for which there could be no satisfactory explanation for counsel's conduct. (See *People v. Freeman* (1978) 22 Cal.3d 434, 438 ["an alibi instruction is not necessary in light of the standard instructions regarding reasonable doubt and burden of proof"].) Defense counsel may not have wanted an alibi instruction out of concern that it would distract the jury's attention from the totality of the evidence that could create a reasonable doubt or that it would suggest the only defense was one of alibi.

### b. Penalty phase

When trial counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing," there is a presumption that the result is unreliable and prejudice need not be affirmatively shown. (*United States v. Cronic* (1984) 466 U.S. 648, 658–659.) Defendant contends he was constructively denied counsel when Beswick's motions for appointment and for second counsel were denied, but we have concluded there was no error in denying these motions (see *ante*, pt. II.A.1.). Beswick "gave an opening statement and closing argument, cross-examined the prosecution's witnesses, objected to testimony and exhibits, and presented a number of witnesses on defendant's behalf during the guilt and penalty phases of the trial." (*People v. Williams* (2013) 56 Cal.4th 630, 691.) Defendant thus "fails to show a complete lack of adversarial testing under *Cronic*." (*Ibid.*)

Defendant further contends he was denied effective assistance of counsel at the penalty phase on numerous grounds.

### i. Mental health and social background

Defendant contends that trial counsel was ineffective for failing to investigate and present mental health and social background evidence. However, at trial, counsel presented evidence of defendant's background that portrayed him as a responsible, kind, and nonviolent person who tried to improve the lives of those around him. The jury was aware that defendant had grown up in a large and loving family who had lived in the projects in "one of the worst" neighborhoods in Los Angeles. Despite defendant's challenging economic circumstances and the loss of his father when defendant was 10 years old, defendant never joined a gang but rather joined with others to "get kids out of gangs" and was known by law enforcement officers as a person who was "really trying" to get young people on "the right path." Defendant also was industrious and started working to help support his family when he was only 13 years old. During high school, defendant worked, played football, never missed school, and graduated when he was 17 years old. While still a teenager, defendant opened his own body shop and ran it for five years, employing younger individuals in an effort to teach them a skill and assist them in avoiding involvement in gangs and with drugs. Even after defendant's shop closed, he continued doing body work until the time of his arrest, always passing on his profits to his young trainees. Defendant also passed the written, but not the physical, test to become a firefighter. Although defendant struggled with drug abuse, he ultimately overcame his addiction and had been drug-free for 10 years. Defendant married his high school sweetheart, was married for 17 years, and had three daughters, one of whom was a student at UCLA. Defendant had no adult felony convictions.

This evidence shows that counsel did investigate defendant's social history. Defendant contends that Beswick's failure to hire an investigator or conduct additional investigation fell below professional norms. But at the evidentiary hearing on his new trial motion, defendant presented no testimony or other evidence about defendant's mental health or social background that would have created a reasonable probability of a different outcome had Beswick introduced it in the penalty phase. We are unable to find ineffective assistance of counsel on this record.

### ii. Drug use

Defendant contends Beswick was deficient in failing to investigate, hire an expert to investigate, or present evidence of defendant's long-term drug use. Beswick testified at the evidentiary hearing that defendant did not want to be examined or have his drug treatment records obtained, and did not want his drug use brought up in the penalty phase because he did not want to contradict his guilt-phase testimony. Although Beswick told defendant he "wanted to do it" and he "thought we should do it," defendant said, "No. Absolutely don't." Apparently, defendant did not want to undercut the credibility of any testimony he might give in the penalty phase by calling into doubt his credibility during the guilty phase. "After having been advised by counsel, if a competent defendant decides . . . to present no mitigating evidence, he cannot later label counsel ineffective for honoring defendant's own wishes." (*People v. Brown* (2014) 59 Cal.4th 86, 112.)

### iii. Head injuries

Defendant contends Beswick was ineffective for failing to investigate whether defendant had suffered brain damage resulting from his multiple head injuries, the medical effects of his mother's toxemia while she was pregnant with him, and the "effect of these events on [defendant's] brain functioning and

behavior." Defendant notes that when he was four years old, he fell headfirst off a chair, broke a vertebrae in his neck, and was placed in traction and hospitalized for two weeks, and that as an adult he suffered a head injury at work. Defendant also contends he "may have had prenatal difficulties due to his mother's toxemia and injuries associated with her seizures during his birth."

Again, defendant presented no evidence at the evidentiary hearing of brain damage resulting either from his fall as a young child or his work injury as an adult, or any effect on his brain functioning and behavior from his mother's toxemia. Beswick testified that the work injury document introduced at the evidentiary hearing stated that defendant had strains and sprains, and that he was prescribed physical therapy and Motrin. William Pitman, defendant's counsel, described the document as relating to an exam performed a month after the accident and said he did not have a doctor's statement or know if defendant had been hospitalized or if X-rays were taken. The trial court responded, "I would expect if there were severe skull injuries, severe brain injuries, since you have [defendant's] release and since this is all you have submitted, that they don't exist; and if there were, you would be submitting those." No reasonable probability of a different outcome has been demonstrated on this record.

### iv. Father's death

Defendant asserts trial counsel was deficient in failing to investigate the emotional and psychological effect on defendant of his father's death when defendant was 10 years old and his mother's remarriage three years later to an abusive alcoholic. The jury was aware that defendant's father died when he was 10 years old, and defendant's sister Barbara testified that after their father's death, defendant assumed a father figure role because he "felt that since our father was gone and he was a bigger guy," he should "protect all of us." Defendant presented

88

evidence at the evidentiary hearing that his stepfather was verbally abusive to his mother, "shoved [her] around" in front of defendant, and at times was physically abusive to his sister Barbara. But defendant and his stepfather "g[o]t along," and when defendant was an adult, they worked together at the dairy. No reasonable probability of a different outcome has been demonstrated on this record.

### v. Neighborhood

Defendant contends that Beswick "failed to investigate the influence of [defendant's] poverty-ridden Hispanic background on his upbringing or the impact of the notorious gang activity in and around" the projects. Defendant says that he "was exposed to the murderous activity of gangs in his neighborhood, where people he knew were often shot and killed," and that because of his stepfather's abuse, his home had "ceased to provide a safe haven." Other than the stepfather's abuse, which we have addressed above (*ante*, pt. II.D.2.b.*iv*.), this information was presented at trial. Beswick sought to portray defendant as a valuable person who, despite his difficult childhood circumstances, had not succumbed to them but rather joined an organization devoted to "get[ting] kids out of gangs," graduated from high school, married and had a family and supported them by working two jobs, and hired young people as assistants on his car body repairs so that they could learn a trade and have an alternative to a life of gangs and drugs. No reasonable probability of a different outcome has been demonstrated on this record.

### vi. Richard Morrison

Defendant contends that defense counsel was ineffective for failing to investigate prosecution witness Richard Morrison. (See *ante*, at p. 26.) Morrison's testimony was ruled inadmissible at the guilt phase, but after the defense case at the penalty phase, the evidence was admitted over defendant's

prejudice objection to rebut defendant's showing of his nonviolent character. Defendant did not ask Beswick about this issue at the evidentiary hearing, nor did he introduce evidence showing what further investigation would have revealed. No ineffective assistance of counsel has been demonstrated on this record.

### vii. Opening the door

Defendant contends trial counsel was ineffective because he opened the door to otherwise inadmissible evidence concerning defendant's history of arrests and his threat to Morrison at the dairy. Beswick asked defendant's mother if defendant had been in trouble with the law before graduating from high school and if he had been convicted of a felony as an adult. Beswick asked defendant's sister Leandra if she had seen evidence defendant was a violent person while they were growing up, and he asked defendant's sister Barbara if she had ever seen defendant "in a fit of rage" or having a physical confrontation while they were growing up. Beswick also asked Barbara if defendant "got in trouble when he was in school" or had any "run-ins with the law" or "arrests," and then asked if defendant had been convicted of a felony as an adult. Before cross-examining Barbara, the prosecutor sought leave to ask her about defendant's arrests. Beswick objected, arguing that "the line of questioning was as to convictions." The court said that although the prosecutor could cross-examine on the issue, "I don't want you to go too deeply into facts of the arrest." The prosecutor then asked Barbara if she was aware that defendant had been arrested in 1974 for grand theft auto, 1975 for petty theft, 1977 for possession of a controlled substance, 1984 for carrying a concealed weapon, 1986 for possession of PCP for sale, and in 1990 for "ADW, 245(a)(1) of the Penal Code."

90

The prosecutor asked Barbara only if she was aware of the arrests, and defendant subsequently testified and explained the circumstances of several of the arrests. The jury was instructed that the attorneys' questions were not evidence, and it was undisputed that defendant had no adult felony convictions. On this record, defendant cannot show prejudice resulting from Beswick's performance.

Nor is prejudice demonstrated by the fact that defense witness testimony regarding defendant's nonviolent nature opened the door to Morrison's rebuttal testimony. Beswick effectively cross-examined Morrison, establishing that Morrison did not recall the exact year of the alleged incident, that before the incident he considered defendant a "regular, friendly fellow worker" with whom he had never had any confrontation, and that Morrison had never reported the incident to police or to his supervisor but simply quit his job the next day without explanation. Beswick was not asked at the evidentiary hearing about his decision to present evidence of defendant's nonviolent nature, and he may have made a tactical decision that the benefit of such evidence outweighed any possible detriment from Morrison's unsubstantiated account.

## CONCLUSION

For the reasons above, we vacate the two true findings on the section 190.2, subdivision (a)(14) special circumstance allegations and otherwise affirm the judgment.

LIU, J.

WE CONCUR:  CANTIL-SAKAUYE, C. J.
                BAXTER, J.
                WERDEGAR, J.
                CHIN, J.
                CORRIGAN, J.
                BANKE, J.*

---

\*     Associate Justice of the Court of Appeal, First Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Carrasco

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S077009
**Date Filed:** August 4, 2014

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Michael B. Harwin

_____

**Counsel:**

Robert R. Bryan, under appointment by the Supreme Court, and Cheryl J. Cotterill for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka and Lance E. Winters, Assistant Attorneys General, Sharlene A. Honnaka, Jamie L. Fuster and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Robert R. Bryan
Law Offices of Robert R. Bryan
2107 Van Ness Avenue, Suite 203
San Francisco, CA  94109
(415) 292-2400

Cheryl J. Cotterill
Law Offices of Robert R. Bryan
2107 Van Ness Avenue, Suite 203
San Francisco, CA  94109
(415) 292-2400

Roberta L. Davis
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-4920